John Arnold **ROHLFING,** as executor of the estate of Samuel Rogers Taylor, and all others similarly situated, Plaintiff,

v.

**MANOR CARE, INC.,** Manor Healthcare Corp., and Vitalink Pharmacy Services, Inc., Defendants.

No. 96 C 3935.

United States District Court, N.D. Illinois, Eastern Division.

March 28, 1997.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Rick D. Young, Edelman & Combs, Chicago, IL, for John Arnold Rohlfing.

James J. Casey, Amy Beth Manning, Scott Steven Becvar, Ross & Hardies, P.C., Chicago, IL, William O. Bittman, Reed, Smith, Shaw & McClay, Washington, DC, for Manor Care, Inc., Manor Healthcare Corp., Vitalink Pharmacy Services, Inc.

*MEMORANDUM OPINION AND ORDER*

ASPEN, Chief Judge:

Plaintiff John Rohlfing[1] has filed a five count complaint against Defendants[2] Manor Care, Inc., Manor Healthcare Corp., and Vi-

talink Pharmacy Services, Inc., alleging claims for antitrust violations, fraud, and breach of fiduciary duty. Rohlfing has filed a motion for class certification. The defendants, in addition to lodging objections to the class motion, have filed a motion to dismiss directed at every count of the complaint. For the reasons set forth below, each motion is granted in part and denied in part.

### I. Background[3]

Manor Care, Inc., owns a large network of nursing homes which provide a variety of services to their residents, ranging from "high acuity" (intensive) nursing care to custodial care and assisted living arrangements. *See* Compl. ¶ 4. There are 179 Manor Care facilities located in 28 different states. *See id.* ¶¶ 4–5. Manor Care operates through a handful of subsidiary corporations. Manor Healthcare Corp. is a wholly-owned subsidiary which is responsible for operating the Manor Care facilities. *See id.* ¶ 4. Eighteen of these facilities, spread across 13 different states, obtain their pharmaceutical services from Vitalink Pharmacy Services, Inc. ("Vitalink"), in which Manor Care holds an 82.3% ownership interest. *See id.* ¶¶ 6–8. In addition to supplying residents with necessary pharmaceuticals, Vitalink also performs a number of consulting services for Manor Care residents, such as monitoring potential drug interaction problems and reviewing patients' drug administration records. *See id.* ¶¶ 9–10. Vitalink also provides similar services to nursing homes outside the Manor Care network, *see id.* ¶¶ 12–13, but despite this alternative source of revenue the compa-

---

**1.** Rohlfing brings this case as the executor of the estate of Samuel Taylor, the individual who was the victim of the defendants' allegedly unlawful conduct. As it would be cumbersome to continually refer to "Taylor's estate" as the plaintiff, this opinion will frequently refer to Rohlfing as if he himself were the plaintiff in this action.

**2.** This opinion will refer to the "defendants" (in the plural) because they are separate corporations, even though this usage is somewhat at odds with the fact that they are under common ownership. This stylistic decision should not be taken as a prejudgment of the question of whether these companies should be viewed as a single entity under the law. This question is critical to the antitrust and RICO claims, and is discussed in Part III, *infra*.

**3.** With respect to both the motion for class certification and the motion to dismiss we are required to assume the truth of the allegations in the complaint. *See Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir.1995) (motions to dismiss); *Hardin v. Harshbarger*, 814 F.Supp. 703, 706 (N.D.Ill.1993) (motions for class certification). In accordance with this principle, this opinion will generally dispense with qualifying terms such as "allegedly" when describing the facts, but this should not be understood as indicating that we have made factual findings. Also, Rohlfing has filed an amended complaint in this case. Consequently, any references to "the Complaint" in this opinion are to the amended complaint.

ny remains closely connected to Manor Care, on which it depends for a number of essential services, including tax services, legal services, accounting services, insurance, preparation of SEC filings, and access to credit. *See id.* ¶¶ 11, 14.

On June 2, 1995, Samuel Taylor entered the Manor Care facility located in Hinsdale, Illinois. *See id.* ¶ 16. In order to gain entry, Taylor signed Manor Care's "Admission Agreement," which is a form contract provided by Manor Care to all prospective residents. *See id.* ¶ 18. Among the many provisions in this contract is one pertaining to pharmaceutical services: it indicates that the facility has developed a number of policies and procedures regarding drug therapy, and that it has selected a "Designated Pharmacy" that is equipped to meet these requirements. *See id.* ¶ 21. The prospective resident has the right to select a different pharmacy of his own provided that his choice is capable of complying with Manor Care's policies and procedures. *See id.* ¶¶ 21–22. The Manor Care pharmaceutical policy requires, among other things, that medications be individually sealed in a manner that is difficult, if not impossible, for most retail pharmacies to emulate. *See id.* ¶¶ 23–27.

For the Manor Care facility Taylor entered, the Designated Pharmacy was a Vitalink franchise. In an effort to persuade residents entering its facilities to select Vitalink as their pharmaceutical services provider, Manor Care provided them with a Vitalink brochure touting Vitalink's array of services. *See id.* ¶¶ 28–30. This brochure represented that Vitalink's services would meet residents' needs at lower cost than other retail pharmacies. *See id.* In fact, the goods and services provided by Vitalink cost Manor Care residents substantially more than the prevailing retail price. *See id.* ¶ 41. But notwithstanding the high prices, Taylor, like most other Manor Care residents, selected Vitalink as his Designated Pharmacy because he had no practical alternative: no other pharmacy was able and willing to comply with the strict packaging rules enforced at Manor Care fa-

cilities. *See id.* ¶¶ , 32, 37–39. Taylor resided at Manor Care and received pharmaceutical services from Vitalink for a time, but is now deceased.[4]

Rohlfing, on behalf of Taylor's estate, now seeks to recover the excessive pharmaceutical fees Taylor was forced to pay as a result of the defendants' policies, plus damages and attorney's fees. Rohlfing claims that the defendants violated: (1) the Sherman Act, 15 U.S.C. §§ 1–2; (2) the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.; (3) the Illinois Consumer Fraud Act (ICFA), 815 ILCS 505/1 et seq.; and (4) the common law fiduciary duty owed by Manor Care to Taylor.

In addition to the claims on behalf of Taylor alone, Rohlfing has moved to certify a class of similarly situated persons who satisfy the following criteria: "(a) they signed an agreement with a Manor Care nursing home facility the same as or similar to [Taylor's]; (b) they chose the 'designated pharmacy' for provision of pharmaceutical services to them during their residency at the Manor Care nursing home facility; (c) the 'designated pharmacy' was Vitalink; and (d) the resident was charged by Manor Care and/or Vitalink for pharmaceutical goods and/or services provided by Vitalink." *See* Pl.'s Motion at 1. In accordance with Rule 23(c)(1) of the Federal Rules of Civil Procedure, we will first rule on this motion for class certification. Once we have determined whether a class should be certified on any or all of the claims, we will address the defendants' motion to dismiss.

## II. Motion for Class Certification

### A. *Rule 23 Standard*

Federal Rule of Civil Procedure 23(a) specifies four preliminary requirements that any proposed class must meet: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses

---

4. The Complaint neglects to allege the date of Taylor's death or the duration of his stay at Manor Care. Although this deficiency is not fatal given the requirement that pleadings be liberally construed, *see* Fed.R.Civ.P. 8(f), it should be corrected as soon as possible.

of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). If the numerosity, commonality, typicality, and adequacy requirements are satisfied, then we must also decide whether the class qualifies under one of the three subsections of Rule 23(b). In the instant case, the plaintiff seeks certification under Rule 23(b)(3), which authorizes class actions where the "questions of law or fact common to the members of the class predominate over any questions affecting individual members; and [ ] a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The plaintiff bears the burden of showing that the proposed class meets the requirements for certification. *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). In evaluating a motion for class certification we do not examine the merits of the case. *Id.* at 598.

### B. Specific Elements

The defendants do not contend that Rohlfing's proposed class is insufficiently numerous, which is understandable given that the class would include many thousands of current and former residents at Manor Care's various facilities. Nor does Manor Care assert that Rohlfing has failed to allege "questions of law or fact common to the class." *See Rosario v. Livaditis,* 963 F.2d 1013, 1017–18 (7th Cir.1992) (stating that a common nucleus of operative fact is sufficient to satisfy the commonality requirement); *Arenson v. Whitehall Convalescent & Nursing Home,* 164 F.R.D. 659, 663–64 (N.D.Ill.1996) (observing that claims arising out of standard documents or contracts present " 'a classic case for treatment as a class action' " (quoting *Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 121 F.R.D. 664, 669 (N.D.Ill. 1988))). The other elements, however, are contested by the defendants and we will discuss each in turn.

### 1. Rule 23(a)(3)—Typicality

█ To meet the typicality requirement, the named plaintiff acting on behalf of the class must show that his claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario,* 963 F.2d at 1018 (quoting *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983)). This requirement is not particularly strict: it may be met "even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus similarity of legal theory may control even in the face of differences of fact." *De La Fuente,* 713 F.2d at 232.

It is clear from Rohlfing's complaint that he is seeking relief under the same legal theories both for himself and for the class. The defendants contend, however, that there are two factual distinctions between Rohlfing's claims and those of many members of his proposed class. First, they argue that with respect to the fraud claims an individualized inquiry will be required in order to determine what oral representations were made to each class member regarding pharmaceutical purchases. *See* Def.'s Br. at 8. This argument is simply wrong: the plaintiffs' fraud claims are based upon identical written misrepresentations and omissions made by Manor Care in its Admission Agreement and in the Vitalink brochure. Any fraudulent statements made to Taylor were also made to all other class members. *See* Pl.'s Motion at 1. Second, the defendants contend that the varying prices for different pharmaceutical products in different parts of the country, in combination with the different pricing schedules of the various Manor Care facilities, will require individual analysis of each plaintiff's claim to determine (a) if they were damaged at all by the inflated prices, and (b) the extent of the damage. *See* Def.'s Br. at 8. But even if Rohlfing's injuries are quantitatively different from those of other members of the class, this does not mean that his claims are atypical. *See De La Fuente,* 713 F.2d at 232–33 (refusing "to require that each member of a class suffer precisely the same injury as the named class representatives" because "[a]ll members of the class were subject to the same allegedly unlawful practices"); *United Nat'l Records, Inc. v. MCA, Inc.,* 99 F.R.D. 178, 181 (N.D.Ill.1983) (finding typicality in an antitrust case even though the named plaintiffs'

damages might differ quantitatively from those of other class members); *see also Rosario,* 963 F.2d at 1017 (certifying a class even though some class members may have suffered no damages at all). If and when this litigation reaches the stage of calculating damages, it may be impossible for the plaintiffs to continue proceeding as a class, but for liability purposes Rohlfing's claims clearly " 'have the same essential characteristics as the claims of the class at large.' " *Retired Chicago Police Ass'n,* 7 F.3d at 597 (quoting *De La Fuente,* 713 F.2d at 232).

### 2. *Rule 23(a)(4)—Adequacy of Representation*

■ The requirement that the named plaintiff be able to "fairly and adequately protect the interests of the class," Fed. R.Civ.P. 23(a)(4), has two distinct elements: (1) the named plaintiff cannot have antagonistic or conflicting claims with other members of the class; and (2) the named plaintiff and his attorneys must be able to prosecute the action vigorously. *See General Tel. Co. v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1982); *Retired Chicago Police Ass'n,* 7 F.3d at 598. Manor Care argues that Rohlfing cannot meet the first requirement because "there is an inherent conflict between plaintiff's duty as executor of Mr. Taylor's estate ... [and his] obligations to the class, including the obligation to spend estate assets to pay the costs of representation." *See* Def.'s Br. at 9. We do not discern any conflict here—the beneficiaries of Taylor's estate presumably want to prevail in this litigation just as much as the living class members—but even if we did, we think the alleged conflict is eliminated by the fact that plaintiffs' counsel is handling this case on a contingent fee basis, eliminating the need for Rohlfing to spend estate assets. *See* Pl.'s Reply Br. at 9.

The defendants also challenge the ability of the plaintiff and his attorney to prosecute this case vigorously because of the fact that Samuel Taylor, whose estate Rohlfing represents, has died. *See* Def.'s Br. at 9. They suggest that "the difficulties inherent in presenting a claim on behalf of a decedent"— such as proof problems regarding the existence of a fiduciary relationship or establishing what factual representations or omissions were made by the defendant—render Rohlfing an unfit representative. *See id.* We disagree. As discussed *supra* in Part II.B.1, Rohlfing proposes to prove his fraud claims by objective, written evidence, and we see no reason why the existence of a fiduciary duty between Taylor and Manor Care cannot be established despite his death. Thus, we find the defendants' concern to be unfounded, and conclude that Rohlfing and his attorneys are adequate representatives of the class they seek to certify.

### 3. *Rule 23(b)(3)*

#### a. *predominance of common issues*

The first requirement of Rule 23(b)(3) is that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Manor Care contends that none of Rohlfing's four claims satisfy this requirement.

#### i. *antitrust claims*

■ Rohlfing's complaint seeks relief under both § 1 and § 2 of the Sherman Act. *See* Compl. ¶ 60. In order to prevail on a claim under § 1 of the Sherman Act, a plaintiff must prove three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) injury. *See Denny's Marina, Inc. v. Renfro Productions, Inc.,* 8 F.3d 1217, 1220 (7th Cir.1993). The defendants' belief that common issues will not predominate with respect to Rohlfing's § 1 claim is based on its assumption that "the market ... is different in every state and within each area where Vitalink provides pharmaceutical services to Manor Care facilities." Def.'s Br. at 11. According to Manor Care, this means that individual issues will predominate because the questions of whether the various class members were damaged by the conspiracy must be determined locality-by-locality. *See id.* at 10–11.

We do not find Manor Care's argument persuasive. The weight of authority in antitrust cases indicates that the question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the importance of this question

usually warrants treating them as a class. *See, e.g., In re Infant Formula Antitrust Litig.,* No. MDL 878, 1992 WL 503465, at *6 (N.D.Fla. Jan. 13, 1992); *Rios v. Marshall,* 100 F.R.D. 395, 407 (S.D.N.Y.1983); *United Nat'l Records, Inc. v. MCA, Inc.,* 99 F.R.D. 178, 182 (N.D.Ill.1983) ("As in virtually all national horizontal price fixing cases, the conspiracy here will predominate over individual issues such as damages."); *Thillens v. Community Currency Exch. Assoc.,* 97 F.R.D. 668, 682 (N.D.Ill.1983) ("[T]he primary common issue is ... the existence of a conspiracy.... Clearly that issue will predominate the litigation."). The fact that particular individuals may have suffered varying degrees of injury does not overcome this general proposition. *See Arenson,* 164 F.R.D. at 666; *Rios,* 100 F.R.D. at 408. If it is feasible to prove that the plaintiff class as a whole has been injured by the defendants' conspiracy, then the class may be certified even though individual damage questions remain to be resolved at a later stage of the proceedings. *See De La Fuente,* 713 F.2d at 232–33; *Martino v. McDonald's System, Inc.,* 86 F.R.D. 145, 147–48 (N.D.Ill.1980).

Our review of the plaintiffs' allegations leads us to believe that the question of fact of injury is susceptible of class treatment in this case. The conspiracy alleged here is a uniform, nationwide course of conduct by Manor Care and Vitalink toward all class members. *See* Compl. ¶¶ 58–62. The pharmaceuticals being supplied to Manor Care's patients are standardized products, the prices of which can easily be compared to those sold by competitors. *See* Pl.'s Reply Br. at 4 (suggesting statistical sampling). If Rohlfing can show that this conspiracy raised the prices of these products above a competitive level, injury to the whole class of purchasers may be presumed for purposes of class certification. *See In re Workers' Compensation,* 130

F.R.D. 99, 109 (D.Minn.1990) (stating that a showing of injury "may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in raising prices above the competitive level"); *In re Alcoholic Beverages Litig.,* 95 F.R.D. 321, 327 (E.D.N.Y. 1982); *In re Folding Carton Antitrust Litig.,* 88 F.R.D. 211, 215 (N.D.Ill.1980) (collecting cases). On these facts, we find that it will be feasible for this court to determine if the plaintiff class was the victim of a conspiracy, and if its members collectively were injured thereby, and conclude that these common issues predominate over individual issues that may arise with respect to the Sherman Act § 1 claim.

Similar reasoning applies to plaintiffs' claim under § 2 of the Sherman Act. This theory of liability requires the plaintiffs to prove: "(1) the [defendants'] possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). The question of whether Manor Care engaged in a "willful acquisition" of monopoly power is, like the question of whether it engaged in a conspiracy in restraint of trade, common to all members of the class because of its susceptibility to common proof or disproof. And even if Manor Care plans to introduce evidence that its market power varies from region to region, *see* Def.'s Br. at 12, at most this implies that it may become necessary to break the class into subclasses after the common question of "willful acquisition" has been resolved.[5] *Cf. Martino,* 86 F.R.D. at 148 (noting that factual variations by region may justify regional subclasses).

---

5. In a similar vein, the defendants also contend that it will have localized defenses to the plaintiffs' antitrust claims because many of its allegedly anticompetitive practices are required by particular state regulations. Conceivably such state law variations may eventually require the formation of subclasses as well, but not necessarily. The state regulations issue is intertwined with the central questions of whether Manor Care engaged in an illegal conspiracy or a "willful

acquisition" of monopoly power: to the extent Manor Care can prove that its practices arose from state regulatory schemes rather than an intent to achieve an anticompetitive objective, this tends to disprove the existence of a Sherman Act violation. Thus, the defendants' contentions regarding state law regulations are critical to the all the potential class members, regardless of the laws of their particular state.

## ii. RICO claims

To state a civil RICO claim based upon mail fraud, a plaintiff must show: (1) an enterprise; (2) engaged in a pattern; (3) of racketeering activity; (4) which constituted a scheme to defraud; (5) involving use of the mails in furtherance of the scheme; and (6) the scheme proximately caused injury to the plaintiff. *See McDonald v. Schencker,* 18 F.3d 491, 494 (7th Cir.1994); *see also Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1317, 117 L.Ed.2d 532 (1992) (requiring proximate cause with respect to injury). The issues regarding the behavior of the defendants are obviously common to all plaintiffs, but the defendants argue that individual issues will predominate with respect to (1) the existence of a scheme to defraud, because it will be necessary to determine what misrepresentations or omissions were made to each plaintiff, and (2) whether each plaintiff was proximately injured by relying on such misrepresentations.[6] *See* Def.'s Br. at 13. The very definition of the proposed class refutes the first part of defendants' argument: the class is expressly limited to persons who received or signed specific documents, Pl.'s Motion at 1, so no individualized proof will be needed regarding which misrepresentations were made to whom.[7]

With respect to the reliance argument, we agree with the defendants that plaintiffs presenting a RICO claim must prove that they relied on the defendants' fraudulent statements. *See, e.g., Caviness v. DeRand Res. Corp.,* 983 F.2d 1295, 1305 (4th Cir.1993); *In re EDC, Inc.,* 930 F.2d 1275, 1280 (7th Cir. 1991) (requiring reasonable reliance in a civil RICO case). This principle, however, derives from RICO's requirement of proximately caused injury, not from the predicate offense of mail fraud. *See* 2 ARTHUR F. MATHEWS ET AL., CIVIL RICO LITIGATION § 8.04[B][1] (2d ed.1992). Courts have adopted two different approaches to the reliance requirement in RICO class action suits based on fraud. When the fraud was perpetrated in a uniform manner against every member of the class, such as when all plaintiffs received virtually identical written materials from the defendants, courts typically hold that individual reliance questions do not predominate. *See, e.g., Heastie v. Community Bank,* 25 [125] F.R.D. 669, 675 (N.D.Ill.1989) (Aspen, J.); *Smith v. MCI Telecomm. Corp.,* 124 F.R.D. 665, 679 (D.Kan. 1989); *McMahon Books, Inc. v. Willow Grove Assocs.,* 108 F.R.D. 32, 38 (E.D.Pa. 1985); *see also* 2 MATHEWS ET AL., *supra,* § 8.04[B][1][a]. But when the fraudulent conduct was not uniform with respect to all plaintiffs, such as when numerous oral misrepresentations are alleged or when claims are based on advertisements that may not have been seen by every plaintiff, courts treat individual reliance questions as predominating over the common RICO issues. *See, e.g., Martin v. Dahlberg, Inc.,* 156 F.R.D. 207, 215–16 (N.D.Cal.1994) ("[T]he lack of evidence of the existence of a fixed set of written materials ... prevents this Court from engaging in the kind of analysis which allowed the courts in cases such as *Heastie* ... to find that individual issues of reliance did not predominate."); *Elliott v. ITT Corp.,* 150 F.R.D. 569, 584–85 (N.D.Ill.1992); *Strain v. Nutri/System, Inc.,* Civ. A. No. 90–2772, 1990 WL 209325, at *7–8 (E.D.Pa. Dec. 12, 1990).

In this case, the proposed class would only include persons who signed the Manor Care contract and who also received specific written statements regarding pricing at Vitalink pharmacies.[8] *See* Pl.'s Motion at 1. Thus, the

---

**6.** Manor Care also argues that individual issues will predominate with respect to the question of the degree of injury suffered by each plaintiff because of the scheme to defraud, but even if so, this does not preclude class certification on the question of liability for the same reasons set forth *supra* with respect to the antitrust claims.

**7.** The complaint alleges no oral misrepresentations, which distinguishes this case from those cited by the defendants for the proposition that individualized proof of fraud is necessary. *See*

Def.'s Br. at 13–14; *cf. Arenson,* 164 F.R.D. at 665 (finding that common questions predominated where written rather than oral misrepresentations were alleged).

**8.** The Complaint alleges that all parties entering Manor Care facilities received these brochures, but the definition of the proposed class does not include receipt of the brochure as an element. For the sake of clarity—and because of the importance of the brochures to the fraud claims—

complaint here falls squarely into the 'common documents' category of cases where reliance questions do not predominate. In cases like this one, where the common documents include a contract to which every plaintiff is signatory, it is particularly sensible to view reliance questions as secondary: by definition, parties to a contract are aware of and rely on the representations or omissions in the contract. Thus, we conclude that common questions predominate with respect to the RICO claim.

### iii. ICFA claims

To state a claim under the ICFA, plaintiffs must show: (1) that the defendants engaged in a deceptive act or practice; (2) intent on the defendants' part that the plaintiffs rely on the deception; and (3) that the deception occurred in the course of conduct involving trade or commerce. *See Adler v. William Blair & Co.,* 271 Ill.App.3d 117, 207 Ill.Dec. 770, 777, 648 N.E.2d 226, 233 (1995). The plaintiffs need not show that they actually relied upon the deception. *See id.*

■ Before we can decide whether common issues predominate with respect to the plaintiffs' ICFA claims, we must first resolve the threshold question of whether the ICFA even applies to the plaintiff class as a whole. There is a split of authority regarding the applicability of the ICFA to consumers who are not Illinois citizens. The defendants direct our attention to a line of cases holding that only Illinois consumers have standing to assert claims under the ICFA. *See Endo v. Albertine,* No. 88 C 1815, 1995 WL 170030, at *6 (N.D.Ill. Apr. 7, 1995); *Swartz v. Schaub,* 818 F.Supp. 1214, 1214 (N.D.Ill.1993) (Shadur, J.). Rohlfing refers to contrary authority indicating that the ICFA may apply to non-resident plaintiffs who are injured by deceptive acts perpetrated in Illinois. *See Martin v. Heinold Commodities, Inc.,* 117 Ill.2d 67, 109 Ill.Dec. 772, 778–79, 510 N.E.2d 840, 846–47 (1987) (applying the ICFA to a class that included non-Illinois residents); *see also Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.,* No. 92 C 2379,

1993 WL 239051, at *7 (N.D.Ill. June 28, 1993) (applying ICFA when there was "conduct committed in Illinois or directed at Illinois residents"), *aff'd,* 61 F.3d 1250 (7th Cir. 1995); *Fry v. UAL Corp.,* 136 F.R.D. 626, 637 (N.D.Ill.1991).

Even if we were to side with the authorities cited by Rohlfing, however, this would not lead us to conclude that the ICFA should have extraterritorial application in this case because the claims of the non-Illinois plaintiffs have little or no connection to Illinois. The facts here are meaningfully different from those in *Martin,* upon which the plaintiffs principally rely, *see* Pl.'s Reply Br. at 13. In *Martin,* a plaintiff class consisting of both Illinois and non-Illinois residents brought suit against an Illinois company that had served as broker for the plaintiffs in commodities transactions. *See Martin,* 109 Ill. Dec. at 773, 510 N.E.2d at 841. The broker relationship had been established by a contract which allegedly contained deceptive statements. The Illinois Supreme Court elected to permit certification of the plaintiffs' claims under the ICFA, even with respect to the non-Illinois plaintiffs, but specifically predicated its decision on the following facts: (1) the contracts containing the deceptive statements were all executed in Illinois; (2) the defendant's principal place of business was in Illinois; (3) the contract contained express choice of law and forum selection clauses specifying that any litigation would be conducted in Illinois under Illinois law; (4) complaints regarding the defendant's performance were to be directed to its Chicago office; and (5) payments for the defendant's services were to be sent to its Chicago office. *See id.* 109 Ill.Dec. at 779, 510 N.E.2d at 847. In light of the overwhelming connection between Illinois and the claims of all the plaintiffs, the court concluded that the ICFA could apply to the whole class. *See id.*

■ In contrast to *Martin,* in this case there is virtually no connection to Illinois for those plaintiffs who are not Illinois residents.[9] The complaint contains no allega-

---

receipt of the brochure should be added to the class definition.

9. Though we need not reach this question given our interpretation of the ICFA, the near-complete lack of contact between the claims of the non-

tions regarding where the various "Admission Agreement" contracts were executed, but it seems reasonable to assume that they were executed at the various Manor Care facilities where each plaintiff planned to reside. The defendants are incorporated in Delaware; Manor Care's principal place of business is in Silver Spring, Maryland, while Vitalink's is in Naperville, Illinois. *See* Compl. ¶ 89 & Ex. D. The contracts all contain an express choice of law provision indicating that the agreement shall be governed by "the laws and regulations of the state where the [Manor Care] facility is located." *See* Compl. Ex. A (clause 25). There are no indications in the contracts that persons seeking to enter a Manor Care facility outside of Illinois will have any contact whatsoever with the state of Illinois. On these facts, where the only connection with Illinois is the headquarters of one defendant, we conclude that the ICFA does not apply to the claims of the non-Illinois plaintiffs even under the broad application of the ICFA

endorsed by *Martin* and other similar cases.[10] Thus, since the ICFA applies to just a small subset of the proposed class—those who were injured by conduct committed in Illinois, or whose injuries occurred there—common issues clearly do not predominate, and we decline to certify a nationwide class with respect to this claim.[11]

### iv. fiduciary duty claims

 As with the ICFA claims, the question of whether common issues predominate for the plaintiffs' fiduciary duty claims depends, at least in part, on the law applicable to the claims. Illinois applies the 'most significant relationship' test from the Restatement (Second) of Conflict of Laws in determining what law will apply to a fiduciary duty claim. *See Koutsoubos v. Casanave,* 816 F.Supp. 472, 475 (N.D.Ill.1993) (Aspen, J.); *see also Marberg v. Chancellor,* No. 93 C 6739, 1994 WL 48600, at *3 (N.D.Ill. Feb. 16, 1994).[12] This test requires us to consider:

---

Illinois plaintiffs and Illinois might render it impossible for us to apply Illinois law to the claims of non-Illinois plaintiffs without violating the constitutional requirements of procedural due process. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821, 105 S.Ct. 2965, 2979, 86 L.Ed.2d 628 (1985) (holding that the Due Process Clause forbids a forum state from applying its own law to every member of a class unless the state has a " 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests' " (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981))).

**10.** Perhaps in recognition of the fact that there is no other reason to apply the ICFA to the claims of the non-Illinois plaintiffs, the plaintiffs suggest that the defendants' fraud scheme "emanated" from Illinois. *See* Compl. ¶ 76; Pl.'s Reply Br. at 11. We are not sure exactly what the import of this cryptic assertion is: the plaintiffs have not provided any justification for applying the ICFA to claims by non-Illinois parties merely because a scheme "emanated" from the minds of persons in Illinois. Even giving the broadest possible reading to *Martin* and its progeny, we think the ICFA cannot apply to claims by out-of-state parties unless the "deceptive act or practice" of which they complain was perpetrated in Illinois. We draw support for this view from an article on the applicability of the ICFA authored by Rohlfing's counsel. *See* Daniel A. Edelman, Applicability of the Illinois Consumer Fraud Act in Favor of Out-of-State Consumers, 8 Loy. CONSUMER L. REP. 27, 34 (1996) (concluding

that the ICFA should apply to transactions in which an Illinois business injures consumers located in other states because it is "[t]he fact that prohibited conduct takes place [in] Illinois [that] establishes that the state officials have an interest in regulating such conduct"). Here, the non-Illinois plaintiffs were injured by misrepresentations or omissions made outside of Illinois, so Illinois officials have no interest in regulating the conduct that injured them.

**11.** For the Illinois residents included in the plaintiffs' proposed class, common issues clearly predominate with respect to the ICFA claim. The elements of an ICFA claim, as discussed *supra*, are all related to the conduct and intent of the defendants, and individual reliance on the deceptive acts is irrelevant. In the instant motion, however, plaintiffs have not requested certification of a class limited to Illinois residents for purposes of their ICFA claim.

**12.** We note that some of our colleagues have disagreed with our view in *Koutsoubos* that a breach of fiduciary duty should be viewed as a tort claim rather than a contract claim for choice of law purposes. *See, e.g., Bankard v. First Carolina Communications, Inc.,* No. 89 C 8571, 1991 WL 268652, at *11 (N.D.Ill. Dec. 5, 1991) (applying contract choice of law principles to a fiduciary duty claim); *T–Bill Option Club v. Brown & Co. Sec. Corp.,* No. 88 C 8461, 1990 WL 103584, at *1 (N.D.Ill. July 2, 1990) (same). The application of contract or tort choice of law principles makes no difference in this case, however: both lead to the conclusion that the claims of the

(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the parties' domiciles and places of business; and (d) the place where the parties' relationship is centered. *See Miller v. Long–Airdox Co.*, 914 F.2d 976, 978 (7th Cir.1990). In most cases, "the two most important [factors] are the place where the injury occurred and the place where the conduct causing the injury occurred." *Id.* In this case, the injury and the conduct causing it occurred in the state where each plaintiff resided and purchased pharmaceuticals during his or her time with Manor Care, and their respective relationships are centered in these various states. Thus, we conclude that each plaintiff's claim for breach of fiduciary duty will be governed by the law of the state of the Manor Care facility in which that plaintiff resided.

■ The application of 13 different states' laws [13] to the plaintiffs' fiduciary duty claims does not automatically mean that common issues will not predominate with respect to these claims, but it does place a burden on the plaintiffs to show that these laws are either identical in all relevant respects or capable of being categorized into a limited number of subgroups. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996) ("In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."); *Georgine v. Amchem Prods.*, 83 F.3d 610, 618 (3d Cir.), *cert. granted,* —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996); *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016–17 (D.C.Cir. 1986) (Ruth Bader Ginsburg, J.) (class proponents must prove the absence of relevant variations in applicable state laws). Rohlfing has completely failed to carry this burden, providing us only with the conclusory assertion that the facts of the various plaintiffs' cases "satisfy the basic test for a fiduciary relationship under the law of all states." *See* Pl.'s Reply Br. at 12. But even if we assume that fiduciary duty law, in its broad outlines, is similar from state to state, it may be meaningfully different with respect to its nuances. *Cf. In re American Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir.1996) (decertifying a class because of possible differences in the law of negligence from jurisdiction to jurisdiction); *In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir.1995) (same).[14] Rohlfing has given us no reason to believe that fiduciary duty law has fewer relevant nuances than the law of negligence. Moreover, the difficulty of applying 13 different states' laws is particularly great with respect to an issue like the fiduciary status of a nursing home vis-a-vis its patients, which most of the states have not yet addressed, *see* Pl.'s Reply Br. at 11 (conceding that "this is a relatively new issue").

In addition to the variety of applicable laws, the relative importance of common issues is further diminished by the fact that each plaintiff's fiduciary duty claim will turn on a crucial, individualized question of fact: his or her mental competence and degree of dependence during residence at a Manor Care facility. *Cf. Georgine*, 83 F.3d at 618 ("[Factual] differences, when expotentially magnified by choice of law considerations, eclipse any common issues in this case."). A fiduciary duty exists in relationships where "there is confidence reposed on one side and a resulting superiority and influence on the other." *Davis v. Brickey*, 397 Ill. 556, 74 N.E.2d 710, 715 (1947); *see also Swenson v. Wintercorn*, 92 Ill.App.2d 88, 234 N.E.2d 91, 97 (1968) (a fiduciary must "act in good conscience and good faith and with due regard to the interests of the person reposing [ ]

plaintiffs should be governed by the laws of the various states in which their Manor Care residences are located.

13. We derive the number 13 from the fact that Vitalink operates at Manor Care facilities in 13 states. *See* Compl. ¶ 7.

14. To pick just one example of a potentially important nuance, Illinois law provides that a plaintiff making a fiduciary duty claim that does not rest on one of the traditional "per se" fiduciary relationships must establish the existence of a fiduciary relationship by "clear and convincing" evidence. *See Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir.1992). Do any of the other 12 states involved in this case impose a similar burden on plaintiffs? Rohlfing gives us no indication.

confidence").[15] It is certainly true that "many, if not most nursing home residents are in a vulnerable physical and/or mental state," *Schenck v. Living Centers–East, Inc.,* 917 F.Supp. 432, 438 (E.D.La.1996), which could place their caregivers in a position of confidence and influence. Like the other courts that have addressed this question, however, we are reluctant to stretch this generalization to the point of concluding that all nursing home residents are necessarily subject to the "superiority and influence" of their caregivers. *See id.* (concluding that despite the typical vulnerability of nursing home patients, it "requires factual development to determine if in this case [a] fiduciary duty was created"); *Gordon v. Bialystoker Ctr.,* 45 N.Y.2d 692, 412 N.Y.S.2d 593, 596, 385 N.E.2d 285, 288 (1978) (finding that a nursing home was a fiduciary for a resident based on testimony that the residents of that home were "dependent on the home 'to take care ... of their very livelihood, their existence'"); *Davis,* 74 N.E.2d at 715 (finding that a nursing home was a fiduciary for a resident only after finding that she was "unable to serve herself in any way"). The potential variation in nursing home patients' competence and degree of dependence is especially significant for a massive operation like Manor Care, which services the entire spectrum of patient needs, from patients requiring round-the-clock skilled nursing care to those who require minimal assistance. *See* Compl. Ex. D at 3 (Manor Care's 10–K filing, describing its operations). Given this variety, we cannot assume that Manor Care had a relationship of "superiority and influence" with every member of the proposed class, and we conclude that an individualized inquiry will be required.

In sum, it appears that plaintiffs' fiduciary duty claims will be governed by a myriad of different laws, and their resolution will depend largely on the determination of an individualized inquiry into their degree of competence and dependence during their residency at Manor Care's facility. On these facts, we find that common issues do not predominate with respect to this claim, and plaintiffs' motion for class certification is denied.[16]

### b. Superiority

■ The final requirement imposed on class proponents by Rule 23(b)(3) is a showing that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). Rule 23 lists a number of factors that might support a finding that a class could not meet this standard, but in this case the defendants focus on just one: whether "difficulties [are] likely to be encountered in the management of [the] class action." Fed.R.Civ.P. 23(b)(3)(D). The defendants assert that this case will be unmanageable as a class action, *see* Def.'s Br. at 15–16, but they provide practically no explanation for this view other than the fact that the case may potentially involve "hundreds of thousands" of past and present Manor Care residents.[17] It is clear, however, that large class size alone is not an impediment to class certification. *Cf. Appleton Elec. Co. v. Advance–United Expressways,* 494 F.2d 126, 127 (7th Cir.1974) (certifying a plaintiff class of "several million shippers"). A large class may actually militate *in favor* of class certification in some cases, since there may be fewer manageable "alternative methods for the fair and efficient adjudication of the controversy." *See* 1 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 4.33 (3d ed. 1992) ("Ironically, as a class increases in size, the alternative

---

**15.** This is the formulation employed by Illinois courts; obviously the 12 other states involved in this case may use different language.

**16.** In contrast to plaintiffs' ICFA claim, the commonality problem is not eliminated by limiting the class to parties from Illinois: the key individualized fact question (degree of influence and superiority) still remains even if Illinois law applies to every plaintiff. Thus, the fiduciary duty claim will survive only with respect to the named plaintiff.

**17.** The defendants' observation that "[c]ourts have frequently found nationwide classes inappropriate and unmanageable," *see* Def.'s Br. at 16, is both true and irrelevant; courts also frequently find nationwide classes to be appropriate, efficient, and manageable. The defendants make no attempt to explain why this case is more similar to the unmanageable cases than the manageable ones.

methods for adjudicating the controversy become fewer.").

At this stage of the litigation, it appears that a class action would be manageable. There is no reason to believe that identifying and providing notice to potential class members will be unduly difficult or that intolerably large amounts of individual testimony will be required at trial.[18] Moreover, we do not see any realistic alternatives to class proceedings in this case. *See In re Folding Carton Antitrust Litig.*, 88 F.R.D. 211, 216 (N.D.Ill.1980) ("Manageability problems are significant only if they create a situation that is less fair and efficient than other available [alternatives]." (internal quotation marks omitted)). For a group this numerous, joinder or intervention by tens of thousands of individual claimants is likely to be more burdensome for the court than treating them as a class. *See* 7A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1779 (2d ed. 1986) ("[I]f the interested parties are so numerous that their joinder or intervention would burden the court ... a Rule 23(b)(3) action should be allowed."). And it is not reasonable to expect the individual plaintiffs in this case to bring their claims against the defendants independently: for many of them, especially those who resided at a Manor Care facility for a short period, the dollar value of their claims is likely to be very small, giving them little incentive to sue on their own. *See id.* "( [I]ndividual actions ... may be an inferior alternative to the class action when the economics of the situation make it impossible for the aggrieved members to vindicate their rights by separate actions...."). Thus, for those claims where common issues predominate, we conclude that a class action will be manageable, and that a class is clearly the superior method in which to proceed.

### C. Summary

Rohlfing's motion for class certification is granted with respect to the antitrust and RICO claims. For these claims, the class shall be limited to those persons meeting the criteria specified in Rohlfing's motion, with the additional requirement that the class include only those persons who received: (1) the Vitalink brochure identified in Exhibit D to the Complaint; or (2) a similar written representation that use of Vitalink's services would result in lower pharmaceuticals costs. Rohlfing's motion for class certification is denied with respect to his ICFA claim and his fiduciary duty claim.

## III. Motion to Dismiss

### A. Rule 12(b)(6) Standard

Dismissal under Rule 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). For purposes of this motion, we must take all of the well-pleaded factual allegations in the complaint as true, and construe them in the light most favorable to the plaintiff. *See Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir.1995).

### B. Specific Claims [19]

#### 1. Antitrust Claims

##### a. Sherman Act § 1

■ The defendants argue that Rohlfing's claim alleging a conspiracy in violation of § 1 of the Sherman Act must be dismissed because the defendants are legally incapable of engaging in a conspiracy. *See* Def.'s Br. at 6.[20] We agree. The seminal case on this

18. Individual testimony and evidence are likely to be necessary if the plaintiffs prevail on the liability issues and we are required to calculate damages. As we have already discussed, however, the potential need for individualized damages inquiries does not prevent class certification on the common questions of liability at this stage of the game.

19. The disposition of the various claims addressed below will be binding on the classes certified *supra* in Part II. Thus, the disposition on the antitrust and RICO claims will affect all members of Rohlfing's proposed class who do not opt-out. The disposition of the ICFA and fiduciary duty claims affects only Rohlfing, since no class has been certified with respect to these claims.

20. The defendants also present several other reasons for dismissing plaintiffs' § 1 claims, *see* Def.'s Br. at 2–5, but we need not address these given our resolution of the *Copperweld* argument.

topic is *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which held that because "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act," *id.* at 771, 104 S.Ct. at 2741, these entities are legally incapable of "conspiring" together in violation of § 1, *id.* at 777, 104 S.Ct. at 2745. The Court reasoned as follows:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent.... If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

*Id.* at 771, 104 S.Ct. at 2741–42. The Court refused, however, to consider whether and how this reasoning would apply to alleged conspiracies between a parent and a non-wholly-owned subsidiary, or between "sister" subsidiaries of a common parent corporation. *See id.* at 767, 104 S.Ct. at 2739.

Despite the limited nature of *Copperweld's* holding, lower courts have applied its "unity of interest" reasoning in other contexts. It is now clear that if a unity of interest exists between related corporations, such as parents and majority-owned subsidiaries or "sister" subsidiaries of a common parent, they are incapable of conspiring for purposes of § 1 of the Sherman Act. *See Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1135 (3d Cir.1995); *Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 447 (9th Cir.1993);

*City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 276–77 (8th Cir. 1988); *Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir.1984). Such a unity of interest is very likely to be found when the parent owns a substantial majority the subsidiary's stock. *See* 7 PHILLIP E. AREEDA, ANTITRUST LAW ¶1467a (1986) (concluding that "majority ownership with its centralized power to control, whether or not apparently exercised in detail on a day-to-day basis, presumptively creates a single entity for antitrust purposes"). Even in cases where the parent's ownership interest is not strong, unity of interest may be established if the economic objectives of the corporations are interdependent or if the management of one company exerts almost complete control over the other. *See, e.g., Siegel*, 54 F.3d at 1135 (finding unity of interest where one corporation was an "inseparable part" of the other's management); *Williams*, 999 F.2d at 447 (finding unity of interest between a franchisor and franchisee).

In this case, we believe that Manor Care, Manor Healthcare, and Vitalink share a unity of interest. Manor Care owns 100% of Manor Healthcare, and also owns 82.3% of Vitalink. A number of courts have found a unity of interest based on very similar ownership arrangements. *See, e.g., Coast Cities Truck Sales v. Navistar Int'l Transp. Co.*, 912 F.Supp. 747, 765 (D.N.J.1995) (conspiracy impossible where parent owned 100% of one subsidiary and 70% of another); *Bell Atlantic Bus. Sys. Servs. v. Hitachi Data Sys. Corp.*, 849 F.Supp. 702, 705 (N.D.Cal.1994) (parent owned 100% of one subsidiary and 80% of another); *Total Benefit Servs., Inc. v. Group Ins. Admin., Inc.*, Civ. A. No. 92–2386, 1993 WL 15671, at * 1–2 (E.D.La. Jan. 7, 1993) (parent owned 100% of one subsidiary and 85% of another); *Viacom Int'l, Inc. v. Time, Inc.*, 785 F.Supp. 371, 374 n. 6 (S.D.N.Y.1992) (parent owned 100% of one subsidiary and 82% of another).[21] Rohlfing

---

21. We are not persuaded by the two contrary cases cited by Rohlfing. First, in *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 763 F.2d 1482 (3d Cir.1985), *vacated on other grounds*, 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986), the Third Circuit found that a parent could conspire with a subsidiary in which it owned 79% of the equity stock, *see id.* at 1495 n. 20. The court provided no explanation for this outcome, which seems particularly questionable given that the parent owned 100% of the subsidiary's voting stock, *see id.* at 1486. Moreover, we think that *Tunis's* precedential value is limited in light of the Third Circuit's recent opinion in *Siegel*, a

does not suggest, and we cannot discern, any manner in which the interests of Manor Care and its subsidiaries might diverge. Even aside from the ownership relationship, Manor Care and Vitalink are to a certain extent interdependent: as discussed in the *Background* section *supra*, Manor Care provides a number of essential services for Vitalink. Consequently, we conclude that the defendants are legally incapable of conspiring with one another, and we will dismiss Rohlfing's claims under § 1 of the Sherman Act.

### b. Sherman Act § 2

 In order to state a claim for monopolization or attempted monopolization under § 2 of the Sherman Act, a plaintiff must show that the defendant possessed, or had a reasonable possibility of gaining possession of, monopoly power in a relevant market. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 457–459, 113 S.Ct. 884, 891–92, 122 L.Ed.2d 247 (1993); *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Thus, a plaintiff presenting a § 2 claim bears the burden of alleging a relevant market. *See TV Communications Network v. Turner Network,* 964 F.2d 1022, 1025 (10th Cir.1992). Rohlfing's view is that the relevant market in this case is "the sale of pharmaceutical products to residents of Manor Care nursing home facilities." Compl. ¶ 61; *see also* Pl.'s Br. at 5. At the motion to dismiss stage, our task is not to determine whether the facts support this market definition, but only to ascertain whether the law will permit a class definition of this sort. The defendants argue that the proposed market definition is legally inadequate because it is improper to define a market in terms of a single class of customers. *See* Def.'s Br. at 4. We agree.

A market is "composed of products that have reasonable interchangeability for the purposes for which they are produced."

*United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956); *see also* 2A PHILLIP A. AREEDA ET AL., ANTITRUST LAW ¶ 530a (rev. ed.1995) (defining a market as "an arena within which significant substitution in consumption or production occurs"). A relevant market has two components: a product and a geographic region in which competition occurs. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 320–21, 82 S.Ct. 1502, 1521–22, 8 L.Ed.2d 510 (1962). "In defining a market, one must consider [possible] substitution both by buyers and by sellers." *See Blue Cross & Blue Shield United v. Marshfield Clinic,* 65 F.3d 1406, 1410 (7th Cir.1995). Professor Areeda elaborates on these themes as follows: "A properly defined market excludes other potential suppliers (1) whose product is too different ... or too far away ... and (2) who are not likely to shift promptly to offer defendant's customers a suitably proximate (in both product and geographic terms) alternative." 2A AREEDA ET AL., at ¶ 530a. The defendants are therefore correct in their view that it is improper to define a market simply by identifying a group of consumers who have purchased a given product; rather, the market consists of the array of "interchangeable" products that those consumers confronted when making their product selection, plus those products which could quickly be supplied as interchangeable alternatives.

Given this background, for "the sale of pharmaceutical products to residents of Manor Care nursing home facilities" to constitute a legally cognizable market, plaintiff will eventually be required to prove—though for now he must merely allege—that there were no proximately available substitutes for Manor Care residents who were dissatisfied with the pharmaceutical services there. The complaint tries to allege a lack of available substitutes from the supply side, by suggesting that the defendants have conspired to estab-

---

case cited *supra* in the text, which endorses a liberal application of the unity of interest test. Second, in *Aspen Title & Escrow, Inc. v. Jeld-Wen, Inc.,* 677 F.Supp. 1477 (D.Or.1987), the court found that a parent could conspire with subsidiaries in which it held 60% and 75% interests, *see id.* at 1486. Like *Tunis, Aspen* provides no explanation for why there was no unity of

interest between the parent and the subsidiaries, and, also like *Tunis,* the value of *Aspen* has been undercut by a subsequent opinion of the same court. *See Leaco Enters., Inc. v. General Elec. Co.,* 737 F.Supp. 605, 609 (D. Or. 1990) (precluding a conspiracy claim where a parent owned 91.9% of a subsidiary).

lish "artificial barriers and restraints which prevent any competitor besides Vitalink from providing pharmaceutical services to residents of Manor Care nursing home facilities." Compl. ¶ 62. But the complaint fails to address the demand side: from the face of the complaint, it is clear that a Manor Care resident who was dissatisfied with the service or prices provided by Vitalink could obtain a substitute by transferring to a different nursing home which did not utilize Vitalink.[22] See Compl. ¶¶ 4–7 (indicating that Vitalink only operates at ¶ 18 out of ¶ 179 Manor Care facilities); see also Ex. A at 1 (admission agreement indicating that a resident may terminate residency without penalty on five days notice). There are many suppliers of skilled nursing care and pharmaceutical services besides Manor Care. See Compl. ¶ 12 (approximately half of Vitalink's revenues come from non-Manor Care facilities); see also Compl. Ex. D at 8 (Manor Care's 10–K filing, noting that it "meet[s] competition in each locality" where it operates). Rohlfing does not suggest that there is anything unique about Manor Care facilities that would shield them from price competition with other "interchangeable" nursing facilities. Thus, the relevant market in this case cannot be limited to Manor Care facilities alone: it must be broad enough to encompass all nursing facilities whose services are "reasonably interchangeable" with those provided by Manor Care.

Rohlfing's attempt to avoid this conclusion by relying on *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), is unavailing. *Kodak* was a controversy related to the sale of service and replacement parts for Kodak copiers and micrographic equipment. Independent service organizations (ISOs) brought antitrust claims against Kodak, alleging that by refusing to sell replacement parts to the ISOs Kodak was attempting to monopolize the "market" of repair service for Kodak copiers. *See id.* at 455–56, 112 S.Ct. at 2076–77. Kodak argued that "as a matter of law, a single brand of a product or service can never be a relevant market." *Id.* at 481, 112 S.Ct. at 2090. The Court disagreed with this view:

> The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners. Because *service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts,* the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines.

*Id.* at 481–82, 112 S.Ct. at 2090 (emphasis added) (citation omitted).

Rohlfing argues that the situation here is identical, and that from a Manor Care resident's perspective, the relevant market for pharmaceutical services is composed only of those companies that service Manor Care residents. *See* Pl.'s Br. at 5. There is a fundamental problem with this analogy, however: the owners of Kodak equipment were "locked in" to their relationship with Kodak, which is not true of Manor Care residents. The Court noted that Kodak equipment is expensive, requiring a "heavy initial outlay," *see id.* at 477, 112 S.Ct. at 2087, but once acquired it has little resale value, *see id.* at 457, 112 S.Ct. at 2077. Consequently, Kodak equipment owners dissatisfied with the services or prices offered by Kodak's repair personnel could not terminate their relationship with Kodak without sacrificing their substantial investment in Kodak equipment. *See id.* at 476, 112 S.Ct. at 2087 ("If the cost of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,' will tolerate some level of service-price increases before changing equipment brands."). But any dissatisfied Manor Care

---

**22.** The plaintiff's only attempt to address demand-side substitutability is its argument that Manor Care patients were unable to find an interchangeable substitute *at Manor Care. See* Compl. ¶ 64 (alleging that the defendants have "precluded plaintiff and other residents of Manor Care facilities from purchasing or obtaining medication at a competitive price"). Even if true, this argument is like a consumer going to McDonald's and complaining that the only hamburgers available for purchase are those prepared by McDonald's. This is perfectly true, *at McDonald's.* But any consumer who is not content with a McDonald's hamburger may leave and choose from a myriad of available alternatives. McDonald's refusal to sell Whoppers does not mean that it has monopolized a relevant market for hamburgers.

resident can terminate his or her relationship with Manor Care on five days notice without any apparent pecuniary loss. *See* Compl. Ex. A at 1. Hence, Manor Care residents are not "locked in" to their relationship with Manor Care, and are free to seek interchangeable substitutes for Manor Care's services in a way that Kodak equipment owners are not.

In sum, Rohlfing has failed to allege a relevant market because his proposed market—the sale of pharmaceutical products to residents of Manor Care nursing home facilities—improperly excludes interchangeable substitutes.[23] Because this is the only market that Rohlfing accuses the defendants of monopolizing or attempting to monopolize, *see* Compl. ¶ 61, Rohlfing has failed to state a claim upon which relief can be granted. Accordingly, Rohlfing's claims under § 2 of the Sherman Act will be dismissed.

### 2. RICO claims

The defendants have moved to dismiss Rohlfing's RICO claims on three separate grounds: (1) failure to comply with Rule 9(b) of the Federal Rules of Civil Procedure; (2) failure to allege a RICO "enterprise;" and (3) failure to allege a "pattern" of racketeering activity. *See* Def.'s Br. at 8–1 5. We consider each argument in turn.

#### a. the particularity requirement

█ Rohlfing's RICO claims are predicated on acts of mail and wire fraud. See Compl. ¶ 70. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). In RICO cases based on fraud, "the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identi-

fy the parties to these communications." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir.1994); *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir.1991). The allegations must be specific enough to provide the defendants with a general outline of how the alleged fraud scheme operated and of their purported role in the scheme. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992); *Koulouris v. Estate of Chalmers*, 790 F.Supp. 1372, 1374 (N.D.Ill.1992) (Aspen, J.) (defendants need not be given a "pretrial memorandum containing all the evidentiary support for the plaintiff's case," but only "a brief sketch of how the fraudulent scheme operated, when and how it occurred, and the participants"). In evaluating the sufficiency of the pleadings, we bear in mind the purposes of Rule 9(b): (1) protecting the defendants' reputations; (2) preventing fishing expeditions; and (3) providing adequate notice to the defendants. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir.1994).

Rohlfing's complaint undoubtedly meets the Rule 9(b) standard of specificity with respect to its allegations regarding the "time, place, and content of the mail and wire communications." The complaint alleges that Taylor, like all other members of the class, was given the allegedly fraudulent Vitalink brochure "immediately prior to" his admission to Manor Care. *See* Compl. ¶ 30. The content of this brochure is set forth in the complaint, *see id.* ¶ 28 & Ex. B, and the alleged misrepresentations and omissions in this document are clearly indicated, *see id.* ¶¶ 28, 40. The complaint explains that the U.S. mails were used in furtherance of this scheme because the allegedly inflated invoices for pharmaceuticals purchases were

---

**23.** We emphasize that for purposes of this motion to dismiss we are expressing no view on what the relevant market actually is: we are constrained by the principle that "proper market definition … can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Kodak,* 504 U.S. at 482, 112 S.Ct. at 2090. At the same time, the burden is on antitrust plaintiffs to allege a legally sufficient relevant market. Where the relevant market proposed by the plaintiff is not even *alleged* to encompass all interchangeable substitute prod-

ucts, the market is legally (rather than factually) insufficient, and a motion to dismiss is appropriate. *See Lee v. Life Ins. Co.,* 23 F.3d 14, 18–19 (1st Cir.1994) (indicating that inadequate allegations regarding the scope of the relevant market were a proper ground for dismissal under Rule 12(b)(6)); *TV Communications Network v. Turner Network,* 964 F.2d 1022, 1025 (10th Cir.1992); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 922 F.Supp. 1055, 1062 (E.D.Pa.1996) (dismissing a § 2 claim for failure to allege a legally sufficient relevant market).

sent to Manor Care residents through the mail. *See id.* ¶ 42.

The defendants' best argument that the complaint fails to meet Rule 9(b)'s specificity standard is that it fails to identify precisely which individuals made the misrepresentations and omissions to the various plaintiffs. *Cf. Vicom,* 20 F.3d at 777–78 (noting that because fair notice is the " 'most basic consideration' underlying Rule 9(b) ... the plaintiff who pleads fraud must 'reasonably notify the defendants of their purported role in the scheme' "). Although the defendants' argument has some force, we believe the complaint is sufficiently specific because the role of each corporate defendant in the scheme is reasonably clear. The allegedly fraudulent statements are contained in the corporate brochure authored by Vitalink, which was given to the plaintiffs by Manor Care along with their residence contract. These identical documents were given to every member of the plaintiff class, so we need not be concerned about the possibility of uncertainty regarding which employees said what to whom. At this stage of the game, we do not believe that the failure to identify particular employee participants [21] has denied the defendants their right to be reasonably "appraised of the roles they each played in the scheme," *id.* at 1329, so we conclude that Rohlfing's complaint passes muster under Rule 9(b).[25]

### b. the "enterprise" and "person" requirements

■ The defendants' second objection to Rohlfing's RICO claims is that he has failed to allege an "enterprise" as the statute requires. *See* 18 U.S.C. §§ 1962(a), (b), (c); *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 645 (7th Cir.1995) ("A RICO complaint must identify the enterprise."). To this objection, the defendants append the related argument that Rohlfing has failed to

allege a "person" distinct from the enterprise. *See Haroco v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 402 (7th Cir.1984) (§ 1962(c) requires "some separate and distinct existence for the person and the enterprise"), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). We disagree.

The statute defines an "enterprise" as any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact...." 18 U.S.C. § 1961(4). In elaborating on this statutory theme, the Seventh Circuit has characterized an enterprise as an " 'ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.' " *Richmond,* 52 F.3d at 644 (quoting *Jennings v. Emry,* 910 F.2d 1434, 1440 (7th Cir.1990)). Rohlfing proposes a number of different enterprises, consisting of various combinations of the members of the "Manor Care corporate group consisting of Manor Care and all its subsidiaries." Compl. ¶¶ 66, 77. Under the plain language of the statute as well as the characterization in *Richmond,* these ongoing, structured, corporate entities clearly qualify as "enterprises."

■ The defendants focus most of their energies on arguing that plaintiffs have failed to allege a "person" engaged in "a pattern of racketeering" that is separate and distinct from the enterprise itself. *See* Def.'s Br. at 11–12. Even after an enterprise has been identified, a § 1962(c) plaintiff must also allege that a " 'person' associated with the enterprise conducted or participated, 'directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.' " *Richmond,* 52 F.3d at 646 (quoting § 1962(c)). The alleged "person" must be distinct from the enterprise itself, *see Haroco,* 747 F.2d at 402, and must participate in the conduct of the enterprise's af-

---

24. For the time being, Rohlfing has simply identified these employee defendants as "John Does 1–10." *See* Compl. ¶ 75. Because the particular identities of these employees is a matter peculiarly within the knowledge of the corporate defendants, and because the allegedly fraudulent acts committed by these employees are clearly described, we believe this form of pleading is acceptable. Needless to say, after Rohlfing has had

an opportunity to conduct discovery he will need to identify these individuals and their roles in the alleged fraud scheme with particularity.

25. The defendants have also asserted Rule 9(b) as a reason to dismiss the ICFA claims in the complaint. For the reasons set forth above, we reject this argument.

fairs, not just its own, *see Reves v. Ernst & Young*, 507 U.S. 170, 184, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993). But Rohlfing's Complaint presents a number of legally sufficient persons under this standard: the Manor Care subsidiaries, and a number of individual (though as yet unidentified) executives in the Manor Care hierarchy. To pick just one possible permutation,[26] if the "enterprise" is defined as the "Manor Care corporate group," the Vitalink subsidiary would be a sufficient "person," since the Seventh Circuit has clearly indicated that subsidiary corporations are separate entities that "conduct the affairs" of their parent corporations. *See Haroco*, 747 F.2d at 402–03 ("[A] subsidiary corporation is certainly a legal entity distinct from its parent.... [W]e think it virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation."); *Richmond*, 52 F.3d at 646–47 (discussing *Haroco*); *see also United States v. Robinson*, 8 F.3d 398, 407 (7th Cir.1993) (criminal RICO case holding that the owner of a corporation and the corporation itself are separate entities). Accordingly, we find that Rohlfing has adequately alleged both an enterprise and a person.

### c. the pattern requirement

The defendants' final challenge to Rohlfing's RICO claims is that he has failed to allege a "pattern" of racketeering activity. The statutory definition of "pattern" is not of much assistance here: it merely indicates that a pattern "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). A more fruitful source of guidance on this question is the Supreme Court's discussion in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Court stated that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal

activity." *Id.* at 239, 109 S.Ct. at 2900. With respect to the continuity element,[27] the Court describes it as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. It is clear that the continuity element is satisfied "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 243, 109 S.Ct. at 2902. In light of *H.J. Inc.*, the Seventh Circuit has applied a four-factor test to determine continuity, looking at: (1) the number and variety of the predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. *See J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir.1991); *United States Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1267–68 (7th Cir.1990); *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48 (7th Cir.1989).

Under these principles, Rohlfing has certainly alleged a continuous program of racketeering activity by the defendants. The complaint indicates that the defendants' scheme to defraud Manor Care residents has been in place for at least four years, *see* Compl. ¶ 69, perhaps going back as far as the date of Manor Care's acquisition of Vitalink in 1981, *see id.* ¶¶ 8, 36, and further alleges that the scheme will continue into the future absent judicial intervention, *see id.* ¶ 69. As discussed *supra* with respect to the motion for class certification, the alleged number of victims is in the tens of thousands, perhaps several hundred thousand. Each of these victims suffered a distinct injury, depending on the amount they were overcharged for

---

26. Understandably, Rohlfing elected not to commit itself to one particular enterprise/person combination in its complaint. Indeed, based on the allegations, a number of satisfactory enterprise/person combinations appear possible. There is no need for us to set forth more than one of these possibilities in the context of this motion to dismiss.

27. The defendants do not argue that the alleged acts of racketeering activity are unrelated, so we need not discuss this element. *See* Def.'s Br. at 12–15 (discussing only continuity).

pharmaceutical services. Each resident was the victim of a separate act of fraud, since the fraudulent misrepresentations and omissions were made to each victim individually, immediately prior to their entry into a Manor Care facility. *See id.* ¶ 30. A fair reading of the Complaint as a whole indicates that the practice of "coercing" residents to select Vitalink for their pharmaceutical services is a part of the "regular way of conducting defendant[s'] ongoing legitimate business[es]," *H.J., Inc.*, 492 U.S. at 243, 109 S.Ct. at 2902. Even though all of the predicate act, appear to be related to one general "scheme," the other factors overwhelmingly indicate that the defendants' racketeering activity has been continuous. We conclude that a pattern has been alleged.

#### d. summary

Rohlfing's complaint meets the particularity requirements of Rule 9(b), and has adequately alleged a "pattern" and an "enterprise." As the defendants do not contend that Rohlfing's RICO pleadings were defective in any other way, the defendants' motion to dismiss the RICO claims is denied.

#### 3. ICFA claims

■ To assert a claim under the ICFA, Rohlfing must allege that the defendants have committed "unfair or deceptive acts or practices." 815 ILCS 505/2. The statute indicates that such acts include, but are not limited to, "any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission." *Id.* The defendants contend that Rohlfing has failed to allege an ICFA violation because merely charging excessive prices for products or services does not amount to an "unfair or deceptive act or practice." *See* Def.'s Br. at 15. This argument misses the target by a wide margin.

Rohlfing's allegation is not merely that he has been overcharged for pharmaceutical services, but that the defendants misrepresented the prices he would be charged by falsely claiming that their prices were lower than those of alternative suppliers. *See* Compl. ¶¶ 28–29, 41, 88a. The Complaint explicitly alleges that the omissions and misrepresentations made regarding relative prices were material, *see id.* ¶ 88a, which is sufficient to state a claim under the ICFA. *See Brown v. C.I.L., Inc.*, No. 94 C 1479, 1996 WL 164294, at *8 (N.D.Ill. Apr. 1, 1996); *Dwyer v. American Express Co.*, 273 Ill. App.3d 742, 210 Ill.Dec. 375, 380, 652 N.E.2d 1351, 1356 (1995).[28]

#### 4. fiduciary duty claims

■ As discussed *supra* in Part II. B.3.a.iv, we believe that a fiduciary duty could exist between nursing homes and their residents under certain circumstances. To be specific, a fiduciary relationship would exist if: (1) the resident reposed confidence in the nursing home; and (2) the nursing home were found to be in a position of "superiority and influence" with respect to the resident as a result of this confidence. *See Kolze v. Fordtran*, 412 Ill. 461, 107 N.E.2d 686, 690 (1952); *Davis v. Brickey*, 397 Ill. 556, 74 N.E.2d 710, 715 (1947); *see also Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir.1992) (applying Illinois law and stating that "[t]he essence of a fiduciary relationship is that one party is dominated by the other"). In determining whether a fiduciary relation exists, a court must consider factors such as: "kinship, age disparity, health, mental condition, education, business experience, and the extent of reliance." *Pommier*, 967 F.2d at 1119; *Noah v. Enesco Corp.*, 911 F.Supp. 299, 303 (N.D.Ill. 1995). Rohlfing's pleadings clearly allege the required elements of confidence and influence. *See* Compl. ¶¶ 95–96.[29] Rohlfing also

---

**28.** The defendants also contend that their failure to disclose the relationship between Manor Care and Vitalink does not violate the ICFA because this fact is a matter of public record. *See* Def.'s Br. at 16. But even if so, this does not warrant dismissal of Rohlfing's ICFA claims; as discussed in the text, Rohlfing has properly alleged other deceptive statements and omissions.

**29.** The defendants correctly observe that a party claiming the existence of a fiduciary duty where such a relationship does not exist as a matter of law (such as lawyer-client or principal-agent) must prove the existence of the relationship by clear and convincing evidence. *See Pommier*, 967 F.2d at 1119; *Kolze*, 107 N.E.2d at 690. This point will no doubt be highly relevant at

alleges that the defendants have breached their fiduciary duties by charging him excessive prices for pharmaceuticals. *Cf. Quist v. Dorn,* 301 Ill.App. 264, 22 N.E.2d 729, 732 (1939) ("Courts of Equity will scrutinize with jealous vigilance the transactions between parties occupying fiduciary relations toward each other . . . ."). Thus, Rohlfing has properly alleged a claim for breach of fiduciary duty.[30]

■ The defendants argue that Rohlfing's claim is barred as a matter of law by the economic loss doctrine. *See* Def.'s Br. at 16. This doctrine generally holds that where the duty of a seller of goods or services arises under a contract, the seller may not sue for purely economic damages under a tort theory. *See Congregation of the Passion v. Touche Ross & Co.,* 159 Ill.2d 137, 201 Ill.Dec. 71, 81–82, 636 N.E.2d 503, 513–14 (1994) (collecting cases). The defendants argue that this rule precludes Rohlfing's fiduciary duty claim—which sounds in tort—because the relationship between Rohlfing, Manor Care, and Vitalink arose under a contract, and the complaint alleges only economic damages. This argument ignores an important limitation on the scope of the economic loss doctrine: "The economic loss doctrine does not bar recovery in tort for the breach of a duty that exists independently of a contract." *Congregation of the Passion,* 201 Ill.Dec. at 83, 636 N.E.2d at 515; *see also RTC v. KPMG Peat Marwick,* 844 F.Supp. 431, 435 (N.D.Ill.1994). A fiduciary duty exists independently of any contract between parties, and so the economic loss doctrine is inapplicable to claims for breaches of fiduciary duties. *See FDIC v. Miller,* 781 F.Supp. 1271, 1277 (N.D.Ill.1991) (holding the economic loss doctrine inapplicable to a claim for breach of fiduciary duty because fiduciary and contractual duties "are distinct and impose separate, independent obligations").

## IV. Conclusion

For the reasons set forth above, we will certify the class requested by the plaintiff (with changes as noted) for purposes of bringing a RICO claim against the defendants. Rohlfing's antitrust claims are dismissed with respect to all members of the class who do not opt-out. We decline to dismiss Rohlfing's ICFA and fiduciary duty claims, though these claims will proceed only on behalf of Rohlfing alone. It is so ordered.

---

trial or on a motion for summary judgment, but it is irrelevant with respect to this motion to dismiss: for now, Rohlfing must merely allege the fiduciary relationship, not prove it.

**30.** We agree with the defendants' suggestion that Rohlfing cannot allege a breach of fiduciary duty based on the events surrounding the signing of the residency agreement and his selection of Vitalink as his provider of pharmaceuticals ser-

vices. *See* Def.'s Reply Br. at 22. At the time of these events, prior to Taylor's residency at Manor Care, no confidence or influence could have been present since the parties were still dealing at arm's length. This has no impact, however, on Rohlfing's claim that *after* he took up residency at Manor Care he was overcharged for pharmaceuticals in violation of the defendants' fiduciary duty.