# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 14, 2010

No. 09-40997

Lyle W. Cayce
Clerk

CASA ORLANDO APARTMENTS, LTD., Relating to Pine Haven Apartments; JASPER HOUSING DEVELOPMENT COMPANY, Relating to Pine View Apartments; ALFRED PORKOLAB, JEAN J. PORKOLAB; ALAN B. PORKOLAB, as Trustee for the Porkolab Family Trust No. 1, Relating to Lowell Apartments, Lorain, Ohio,

Plaintiffs - Appellants

versus

FEDERAL NATIONAL MORTGAGE ASSOCIATION,

Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is an interlocutory appeal from the district court's refusal to certify a class. Plaintiff Appellants are mortgagors whose mortgages for low-income multi-family housing were held or serviced by the Federal National Mortgage Association ("Fannie Mae") and insured by the Department of Housing and Urban Development ("HUD"). Plaintiffs sued Fannie Mae on behalf of themselves and those similarly situated for breach of fiduciary duty. The district

No. 09-40997

court denied class certification under all three prongs of the *Federal Rules of Civil Procedure* Rule 23(b).  For the reasons stated below, we AFFIRM.

I.

Since 1969, HUD has required mortgagors participating in its insurance program to sign a Regulatory Agreement.  This Agreement mandated that mortgagors establish two funds with the mortgagee:  1) a Reserve Fund for Replacements ("Reserve Fund") and 2) a Residual Receipts Fund ("Residual Fund").[1]  The Reserve Fund ensured that the mortgagor had money available to effectuate repairs on the HUD-insured property.  The Residual Fund provided additional liquidity to ensure payments on the loan and protect HUD's interests.  According to the Agreement, the Reserve Fund was to be under the control of the mortgagee (Fannie Mae) and the Residual Fund would be under the control of the Federal Housing Commissioner.  Disbursements from the Reserve Fund were only to be made after receiving written consent from the Commissioner.  The Commissioner could also direct disbursements from the Residual Fund for any purpose he saw fit. After repayment of the loan, mortgagees were to refund any remaining amounts in the Funds to the mortgagors.

The Reserve Fund provision of the Agreement specifically contemplated that those funds may take the form of cash deposit or guaranteed investment.  Fannie Mae gave mortgagors certain investment options for both their Reserve Fund and Residual Fund moneys.  Some mortgagors chose to partially or fully

---

[1] The Regulatory Agreement established a fixed amount for regular deposits into the Reserve Fund.  The Residual Fund was predicated upon surplus cash.  In many instances, there was no surplus cash available to be deposited into the Residual Fund.  Therefore, at least some of the class members only had Reserve Funds.

No. 09-40997

invest these funds accordingly. Others elected to retain the liquidity and not invest any such funds. These "uninvested funds" are the subject of this lawsuit.

Appellants contend that the Regulatory Agreement created a fiduciary relationship between Fannie Mae and class members, with Fannie Mae holding the Reserve and Residual Funds in trust for class member mortgagors. Appellants further contend that Fannie Mae breached its fiduciary duties by engaging in self-dealing with mortgagors' uninvested funds, resulting in unjust enrichment.

Between 1969 and 1995, Fannie Mae invested the so-called uninvested funds in the overnight federal funds marketplace, retaining the interest proceeds for itself. Appellants allege that Fannie Mae tried to discourage mortgagor investments so Fannie Mae could maximize the earning potential of its federal funds investments. In 1995, Fannie Mae transferred the servicing of its multi-family mortgages to GMAC Commercial Mortgage Corporation ("GMACCM"). Under this arrangement, GMACCM created custodial bank accounts using Fannie Mae mortgagors' invested and uninvested funds. In return for the large deposits, the banks offered GMACCM lines of credit well below the market interest rates. GMACCM shared the financial proceeds of these favorable credit lines with Fannie Mae, giving Fannie Mae seventy percent of GMACCM's benefit. Appellants argue these proceeds were wrongfully obtained and should be disgorged.

Plaintiff Appellants define their class to include all mortgagors of property located anywhere in the United States whose mortgages: 1) were insured under § 221(d)(3) or § 236 of the National Housing Act; 2) were held or serviced by Fannie Mae; and 3) required the mortgagors to make deposits in Reserve and

No. 09-40997

Residual Funds and where such funds were "uninvested" in part or whole for any period of time. In 1978, Fannie Mae serviced nearly 4,000 potential class mortgages. By 2004 (when this lawsuit was filed), approximately 1,500 such mortgages existed. Mortgagors reside in all fifty states, signed the Regulatory Agreements in various states, and conducted business with Fannie Mae regional offices in Atlanta, Chicago, Dallas, Los Angeles, and Philadelphia. Fannie Mae is headquartered in Washington, D.C.

The district court found that the class satisfied the requirements of Rule 23(a) but denied certification under Rule 23(b).[2] We review a denial of class certification for abuse of discretion, deferring to the district court's ability to manage pending litigation and conduct the factual inquiry necessary for certification.[3] However, we review *de novo* the question of whether the district court applied the proper legal standard.[4]

## II.

Under Rule 23, a class may be certified if it satisfies the requirements of Rule 23(a) and fits into one of the three categories outlined in Rule 23(b). Because we find that choice of law issues are relevant to all three categories, we begin our discussion here.

---

[2] Neither party appealed the Rule 23(a) findings. Therefore, we consider any issues under 23(a) waived and begin our discussion with 23(b). *See In re Tex. Mortgage Servs. Corp.*, 761 F.2d 1068, 1073 (5th Cir. 1985).

[3] *See Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998); *Jenkins v. Raymark Indus.*, 782 F.2d 468, 471-72 (5th Cir. 1986).

[4] *See Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1104 (5th Cir. 1993).

No. 09-40997

In diversity cases, federal courts must apply the choice of law rules of the forum state. We review a district court's choice of law determination *de novo*.[5] Texas courts follow the "most significant relationship" test outlined in the *Restatement (Second) of Conflict of Laws* ("Restatement").[6] The choice of law is evaluated issue by issue.[7] In this case, the lynchpin issue is whether Fannie Mae was in a fiduciary relationship with the plaintiff mortgagors (and subsequently breached its fiduciary duty). Additionally, Plaintiffs seek relief under an unjust enrichment theory.

Section 6 of the Restatement lists the general factors that should inform a choice of law question: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Since this is a breach of fiduciary duty case, we also consider Restatement § 145, which lists the primary factors for choice of law questions in tort cases. These factors are: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality,

---

[5] *See Spence v. Glock*, 227 F.3d 308, 311 (5th Cir. 2000).

[6] *See, e.g.*, *Torrington Co. v. Stuzman*, 46 S.W.3d 829, 848 (Tex. 2000); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420-21 (Tex. 1984).

[7] *See Duncan*, 665 S.W.2d at 421.

place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

Plaintiffs highlight the Restatement's comments, which instruct that when a case involves unfair profit rather than a plaintiff's pecuniary loss, the location of the injury is less important than the location of defendant's conduct.[8] Plaintiffs further advocate that there is no place central to the relationship between Fannie Mae and its borrowers, claiming that each dealt with one another from their respective principal places of business. Therefore, Plaintiffs conclude that the place of the conduct causing the injury and the residence of the parties are the most important factors in this case. Since Plaintiffs reside in all fifty states, Appellants believe we should give greater weight to Fannie Mae's principal place of business, Washington D.C. In addition, Fannie Mae's headquarters is where the conduct causing the breach of fiduciary duty arose—the District of Columbia is where the idea to invest the Funds developed and where policies were created to implement this idea. Thus, Plaintiffs urge us to apply D.C. law to all class members.

In analyzing the Restatement factors *de novo*, we agree with Plaintiffs that the primary purpose of the tort rule involved here leads us to place less importance on where the injury occurred, as disgorgement is not meant to compensate for a loss. But the Restatement's comments also instruct us not to over-emphasize this restriction.[9] A breach of fiduciary duty still causes an

---

[8] *Restatement (Second) of Conflict of Laws* § 145 cmt. f (1971) [hereinafter *Restatement*].

[9] *See Restatement* § 145 cmt. c ("Undoubtedly, the relative weight of these two objectives [deterrence or compensation] varies somewhat from rule to rule, and in the case of a given rule it will frequently be difficult to tell which of these objectives is more important.").

injury, and in this case, those financial injuries occurred in the states where plaintiffs maintain their principal places of business.

For the second factor, we generally agree with Plaintiffs' assertion that the District of Columbia is where the conduct causing the injury occurred.[10] The third factor, domicile of the parties, is also not in dispute.

We disagree, however, with Plaintiffs' assessment of the fourth Restatement factor—where the parties' relationships were centered. The relationship in dispute in this case is a fiduciary obligation that Plaintiffs contend arose from the signing of the Regulatory Agreement and other mortgage documents. Plaintiffs advocate that a trust relationship is created when the parties manifest an intent to create such a relationship. According to Plaintiffs, the trust intent exists in the Regulatory Agreement, Mortgage Deed/Deeds of Trust, and Mortgagee's Certificate. Therefore, the manifestation of that intent must have taken place where and when the parties signed these documents.[11] Additional evidence of manifested intent would occur when and where Plaintiffs

---

[10] Although the idea for the investments may have been generated in the District of Columbia, we acknowledge that some uncertainty exists regarding the location of the conduct causing the injury. Prior to 1995, the actual investing took place in overnight markets in New York. Under the current GMACCM arrangement, the Funds are held in Philadelphia. Thus, at least some of the conduct causing the injury may have occurred outside of Washington. However, since we need not resolve that issue to conclude that D.C. law does not apply to each plaintiff, we assume that the conduct did occur in the District of Columbia.

[11] While we recognize this is not a breach of mortgage agreement case, we note the importance of the mortgage documents to the claims of this case. Those documents allegedly established the fiduciary relationship. In choice of law analysis for breach of mortgage agreement and unjust enrichment, "the location of the mortgaged properties is the single most significant consideration." *Schmidt v. Interstate Federal Savings & Loan Ass'n*, 74 F.R.D. 423, 428 (D.D.C. 1977). Thus, in a case where the mortgage agreement is pivotal, as it is here, the location of the mortgaged property may play a greater role than it would otherwise in a breach of fiduciary claim.

No. 09-40997

delivered deposits (the trust corpus) for the Reserve and Residual Funds. According to the record, one of the named Plaintiffs (the Porkolabs) made deposits to the Atlanta Fannie Mae office, while another (Jasper) conducted business with the Los Angeles office. There is no indication that these Plaintiffs had direct contact with the Washington, D.C. office or manifested an intent to create a trust there.

Plaintiffs assert that this case should follow the choice of law analysis in a Texas appellate case involving securities fraud.[12] There, the defendant resided in New York, which is also where the misconduct occurred. Similarly, Fannie Mae's principal place of business is in Washington D.C., where the misconduct occurred. However, Plaintiffs misapply *Greenberg.* There, the court noted that none of the defendant's conduct "occurred in, or was directed to" the forum state, Texas.[13] In contrast, Fannie Mae conducted business in several regional offices outside of Washington. Moreover, the defendant in *Greenberg* had no knowledge that it was dealing with Texans and no expectation that Texas laws might apply. The court applied New York law based predominantly on reasonable expectations.[14] Here, Fannie Mae knew it was conducting business with plaintiffs in a variety of states. Plaintiffs also knew Fannie Mae operated out of regional offices. Additionally, the Regulatory Agreement, which Plaintiffs rely on for the creation of fiduciary duty, specifically notes that Fannie Mae could

---

[12] *Greenberg Traurig v. Moody*, 161 S.W.3d 56 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

[13] *Id.* at 74.

[14] *Id.; see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822 (1985) (noting that parties' expectations constitute "an important element" of considering whether a choice of law conclusion is fair and constitutional).

bring suit in "any court, State or Federal." Thus, in contrast with *Greenberg*, reasonable expectations in this case do not so clearly point to the application of a single jurisdiction's laws.

Likewise, we are not persuaded that the analysis in *Grant Thornton v. SunTrust Bank*[15] compels us to apply D.C. law to all plaintiffs. In that case, the court found that analysis under the Restatement §§ 148 or 145 did not definitively point to a single jurisdiction.[16] Thus, the court relied on consideration of the § 6 general conflict of law factors rather than the tort-specific factors. The *SunTrust* court found that the policies of the forum state, Texas, protected investors better than the policies of other states. Here, we do not find that the § 6 factors, in conjunction with § 145, lead us to a single jurisdiction applicable for all plaintiffs.

Instead, applying the Restatement's factors highlights the need for multiple state laws to apply to this class. The relevant policies of the interested states and the forum state similarly discourage self-dealing by fiduciaries, but they establish different standards for showing fiduciary duty and sometimes different remedies.[17] Neither party had a justified expectation that one state's law would apply over another. Moreover, the needs of the interstate system

---

[15] 133 S.W.3d 342 (Tex. App.—Dallas 2004, pet. denied).

[16] The court conducted its primary analysis using § 148 for fraud or misrepresentation cases. But it also concluded that it would reach the same result following § 145 for torts, which is what we use here.

[17] *See* Part III, *infra*.

No. 09-40997

direct us not to ignore relevant states' interests in fiduciary law by applying D.C. law to all matters of this case.[18]

While the conduct causing a breach of fiduciary duty may have occurred in the District of Columbia, there would be no fiduciary duty without activity that occurred in other locations.  Since the existence of a fiduciary relationship is critical to this lawsuit, we find that the District of Columbia cannot have the most significant relationship to the issues unless the fiduciary relationship was created and maintained there.  Given the Plaintiffs' interactions with the regional offices (including making payments to regional offices), we find that the intention to create a trust (such as giving property to the trustee) manifested outside of Washington D.C. for many of the Plaintiffs.  As a result, there is no single jurisdictional law that can be applied to the class as a whole.

We make a similar finding with respect to the unjust enrichment claim. Following Texas law, we again turn to the Restatement for guidance on how to examine unjust enrichment claims.[19]  The Restatement offers five factors to be considered in choice of law decisions for unjust enrichment: 1) the place where the parties' relationship was centered; 2) the place where defendants received the benefit or enrichment; 3) the location where the act conferring the enrichment or benefit was done; 4) the parties' domicile or place of business; and 5) the jurisdiction where a physical thing substantially related to the enrichment

---

[18] *See, e.g.*, *Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990) ("Texas has a significant interest in remedying civil injury to Texas citizens through tort liability and also in defining the outer limits of tort liability.").

[19] *See Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004) ("Texas courts use the 'most significant relationship' test set forth in the Restatement . . . for all choice of law cases except contract cases in which the parties have agreed to a valid choice of law clause."); *id.* at 405 (applying *Restatement* § 221).

No. 09-40997

was situated at the time of the enrichment.[20] The primary factor in this analysis is also where the parties' fiduciary relationship was centered, which we conclude will be different for each plaintiff. The second and third factors point to Washington, D.C. but also to Pennsylvania and New York, where the Funds were invested and Fannie Mae held accounts. The fourth factor leads to jurisdiction in all fifty states and the District of Columbia. For the fifth factor, there is likely not a physical "thing" related to the enrichment in this case, but if one exists, it is the investment account located in the District, New York, or Philadelphia. In evaluating these factors, we conclude there are not sufficient contacts to apply D.C. law to each plaintiff's unjust enrichment claim.

To summarize, we find that D.C. law should not be applied to all Plaintiff class members in either the fiduciary law or unjust enrichment claims.

### III.

The choice of law finding most closely interacts with the Rule 23(b)(3) analysis. To obtain certification under (b)(3), the court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Here, Plaintiffs seek to certify a nationwide class for a state common law claim. "In a multi-state class action, variations in state law may swamp any common issues and defeat predominance."[21] In order for common issues to predominate and justify a (b)(3) certification, each state must have the

---

[20] *Restatement* § 221(2).

[21] *Castano v. Amer. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996).

No. 09-40997

same standards for establishing a fiduciary relationship and breaching the resulting duty.

The district court found that the policies of the interested states varied considerably with regard to the fiduciary duties of an escrow administrator. On appeal, Plaintiffs argue that such a finding is irrelevant because they do not rely on traditional fiduciary relationships previously affirmed by state law. Instead, Plaintiffs contend that the Regulatory Agreement and specific circumstances of this case created a fiduciary duty between Fannie Mae and the mortgagors, even if such a duty might not exist in an ordinary escrow account. Plaintiffs allege that this duty would exist in any jurisdiction.

To support their claim, Plaintiffs provided a fifty-one jurisdiction survey and noted that in every jurisdiction a fiduciary relationship is established through the manifestation of an intent to create such a duty. Moreover, Plaintiffs assert that self-dealing is a violation of fiduciary duty in every state. In examining the state laws further, we find that determining when a trust or fiduciary relationship has been created (and breached) is not as uniform as Plaintiffs propose.

While the basic principles of fiduciary law may be the same throughout the country, the nuances vary, and those nuances affect the outcome of claims.[22] In Illinois, for example, a valid express trust requires: 1) intent of the parties to create a trust as shown by a writing or by circumstances; 2) a definite subject matter of trust property; 3) ascertainable beneficiaries; 4) a trustee; 5) specifications of a trust purpose and how the trust is to be performed; and 6)

_____

[22] *See, e.g.*, *Rohlfing v. Manor Care*, 172 F.R.D. 330, 341 (N.D. Ill. 1997) (disussing the importance of nuances in fiduciary law).

No. 09-40997

delivery of the trust property to the trustee.[23]    In a case relying on these standards, the court found there was no trust because checks were payable directly to the defendant rather than to the escrow account.[24]    Thus, under Illinois law, the way the mortgagors' checks were submitted to Fannie Mae would be relevant in determining whether a trust relationship existed.

Under Texas law, a "fiduciary relationship is an extraordinary one and will not be lightly created."[25]    Thus, ordinarily "an express trust does not arise unless the owner of property has shown an unequivocal intention to create a trust."[26] If "the person to whom the settlor's wish is addressed has a clear discretion to act as he thinks fit," no trust is created.[27]    Under the Regulatory Agrement, the Commissioner may direct the Residual Funds for any purpose he determines. Thus, under Texas law, a trust would not be created with those funds.

The District of Columbia has a simpler standard, requiring that "the settlor need only manifest an intention to impose upon herself or upon a transferee of the property equitable duties to deal with the property for the

---

[23] *See In re Estate of Wilkening*, 441 N.E.2d 158, 163 (Ill. App. 1982).

[24] *Hamilton Bancshares, Inc. v. Leroy*, 476 N.E.2d 788, 790-91 (Ill. App. 1985).

[25] *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Div.] 1997, pet. denied).

[26] *Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 438 (Tex. App.—Houston [14th Div.] 2000, pet. denied).

[27] *Alexander v. Botsford*, 439 S.W.2d 414, 417 (Tex. Civ. App.—Dallas 1969, writ ref'd n.r.e.).

benefit of another person."[28] The law of the District of Columbia further requires the trustee to take title of the trust assets.[29]

Even assuming that general fiduciary principles are similar across jurisdictions, Plaintiffs have the responsibility to demonstrate that state law variations do not preclude the certification of a nationwide class.[30] They have failed to do so with respect to the establishment of fiduciary duty. As an Illinois district court noted, "Illinois law provides that a plaintiff making a fiduciary duty claim . . . must establish the existence of a fiduciary relationship by 'clear and convincing' evidence. Do any of the other 12 states involved in this case impose a similar burden on plaintiffs? [Plaintiff] gives us no indication."[31] Likewise, Plaintiffs' survey here fails to show that burden of proof standards do not vary or that differences in state unjust enrichment laws are insignificant. For example, to state a claim for unjust enrichment some jurisdictions require the complainant to prove an actual loss or impoverishment.[32] Such a

---

[28] *United States v. Taylor*, 867 F.2d 700, 703 (D.C. Cir. 1989) (internal citations omitted); *see Fielding v. BT Alex Brown Corp.*, 116 F. Supp. 2d 59, 63 (D.D.C. 2000); *Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C. 1983).

[29] *Fielding*, 116 F. Supp. 2d at 63.

[30] *See Castano v. Amer. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) ("Appellees see the 'which law' matter academic. They say no variations in state . . . laws relevant to this case exist. A court cannot accept such assertion 'on faith.' Appellees, as class action proponents, must show that it is accurate.") (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1016 (D.C. Cir. 1986)).

[31] *Rohlfing v. Manor Care*, 172 F.R.D. 330, 341 n.14 (N.D. Ill. 1997).

[32] *Compare Cmty. Guardian Bank v. Hamlin*, 898 P.2d 1005, 1008 (Ariz. 1995) (listing "impoverishment" as an element of unjust enrichment) *and State v. Barclays Bank of New York, N.A.*, 563 N.E.2d 11, 15 (N.Y. 1990) (noting that plaintiffs must have "suffered a loss" to have a claim for unjust enrichment) *with County of San Bernardino v. Walsh*, 69 Cal. Rptr. 3d 848, 855-56 (Cal. App. 2007) ("The public policy of this state does not permit one to take

No. 09-40997

requirement may be detrimental to Plaintiffs' claims, and Plaintiffs give no indication of why such variances in state law are irrelevant in this matter.

In the class certification hearing below, Plaintiffs' counsel, to his credit, confronted this issue candidly, stating, "if you're not going to apply D.C. law you probably cannot certify the class as we have asked it." Even when so ably put, we are not persuaded by the contention that D.C. law is applicable to all plaintiffs in this case. We cannot find the district court abused its discretion in failing to certify under Rule 23(b)(3).

IV.

Rule 23(b)(1) provides that a class action may be maintained if "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."[33] Plaintiffs urge that multiple lawsuits in this case would impose incompatible standards of conduct upon Fannie Mae; that the Regulatory Agreements require a single standard of conduct from Fannie Mae that makes this class suited to (b)(1)(A) certification.

---

advantage of his own wrong regardless of whether the other party suffers actual damage." (internal quotations omitted)). Another relevant state law difference is that some states, including Texas, preclude unjust enrichment claims when a valid, express contract governing the subject matter exists. *See Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001). Upon review of the merits of this case, a court could find the Regulatory Agreement is a valid contract, which would foreclose the unjust enrichment claim in some states.

[33] Fed. R. Civ. Pro. 23(b)(1)(A). Appellants do not argue that the district court erred in denying class certification under Rule 23(b)(1)(B). Therefore, any such claim is waived.

No. 09-40997

Rule 23(b)(1)(A) focuses on class action suitability from the defendant's perspective. Interpreting this defense-minded rule, the district court held that certification of a 23(b)(1)(A) class is improper without the defendant's consent. The court cited a Beaumont district court that had reached a similar conclusion.[34] We upheld the Beaumont decision in an unpublished opinion and noted that the party opposing the class chose not to avail itself of the safeguards of Rule 23(b)(1)(A). However, our affirmation and the district opinion both cited additional reasons for why certification was not appropriate under 23(b)(1)(A). While we recognize that several district courts outside of this Circuit have at least partially relied on the defendant's opposition in denying (b)(1)(A) certification,[35] we choose not to do so here.

We find nothing in the plain text of Rule 23 that permits a defendant's veto over (b)(1)(A) certification.[36] Instead, we hold that a court may certify a class under (b)(1)(A) if the court finds that separate lawsuits could create inconsistent results that would establish incompatible standards of conduct for the party opposing the class.[37] The Fifth Circuit has previously upheld a class

---

[34] *Corley v. Entergy Corp.*, 222 F.R.D. 316 (E.D. Tex. 2004), *aff'd Corley v. Orangefield Ind. Sch. Dis.*, 152 Fed. Appx. 350 (5th Cir. 2005) (unpublished).

[35] *See, e.g.*, *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 354 (D.N.J. 1997); *Pettco Enters. v. White*, 162 F.R.D. 151, 155 (M.D. Ala. 1995); *Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89 (N.D. Cal. 1972).

[36] *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("The text of [Rule 23] limits judicial inventiveness. Courts are not free to amend a rule outside the process Congress ordered . . . .").

[37] Fed. R. Civ. Pro. 23(b)(1)(A); *Newberg on Class Actions* § 4:7 (2010) (stating that the Advisory Committee Notes "contain no support for the view that the party opposing the class is the exclusive beneficiary" of (b)(1)(A)).

No. 09-40997

certification under (b)(1)(A) despite the defendant's opposition when the district court found that individual actions would create incompatible standards of conduct.[38]

Following the text of Rule 23(b)(1)(A), we do not find that separate actions would result in incompatible standards of conduct for Fannie Mae. First, certification under (b)(1)(A) is seldom appropriate when dealing with monetary compensation because no inconsistency is created when courts award varying levels of money damages to different plaintiffs.[39] Here, four of the ten remedies Plaintiffs seek relate to monetary compensation—providing (or reconstructing) an accounting for Fannie Mae's earnings,[40] disgorging profits earned through breaches of fiduciary duty, and providing restitution of the profits. It would not be incompatible for Fannie Mae to disgorge profits earned from one fund while not disgorging profits earned from a different fund.[41]

Plaintiffs also seek non-monetary injunctive remedies. Plaintiffs request that the court order Fannie Mae to cease its self-dealing, terminate its

---

[38] *Hernandez v. Motor Vessel Skyward*, 61 F.R.D. 558 (S.D. Fla. 1973), *aff'd* 507 F.2d 1278 (5th Cir. 1975), *aff'd* 507 F.2d 1279 (5th Cir. 1975).

[39] *See Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1193 (9th Cir. 2001); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421 n.16 (5th Cir. 1998).

[40] *See Garcia v. Koch Oil Co.*, 351 F.3d 636, 641 (5th Cir. 2003) (noting that a request for an accounting is "simply a tool" for the plaintiff "to determine how much—or, in fact, whether—any money properly his is being held by another").

[41] Plaintiffs argue that such an outcome would be inconsistent because it would create contradicting interpretations of the defendant's obligations. Because of the various state laws involved, we disagree. *See* Part II, *supra*. Moreover, given the differences between the language establishing the Residual and Reserve Funds in the Regulatory Agreement, there may be additional arguments that even under the same state's law, one of those funds may be fiduciary while the other is not.

No. 09-40997

relationship with GMACCM, segregate the Funds accounts, appoint a special master, and refrain from retaliating against any class member. Varying results with respect to these measures are not necessarily incompatible. For example, if one court failed to require Fannie Mae to cease its relationship with GMACCM, Fannie Mae could still end this relationship in order to comply with a different court order. Such action would not be "incompatible" with the first court's order, but rather might exceed what that court demanded.[42]    An incompatible judgment would arise if one court *required* Fannie Mae to continue its relationship with GMACCM while another court *prevented* Fannie Mae from working with GMACCM. Such a scenario is implausible given the facts of this case.

Most importantly, for reasons stated above, we find that various state laws apply to different class members. Therefore, varying judgments with respect to Plaintiffs' injunctive requests would not be "incompatible" but rather would reflect diverse state fiduciary law. As the Supreme Court has advised, Rule 23(b)(1)(A) encompasses cases in which the defendant is obliged by law to treat members of the class alike.[43]  Here, various state laws may result in some class members having a fiduciary relationship with Fannie Mae while others do not. Under Rule 23(b)(1)(A), dissimilar outcomes that result from differing state laws

---

[42]  Plaintiffs also argue that the Advisory Committee finds that breach of fiduciary duty is one of six types of cases "especially appropriate" for (b)(1) treatment. However, Appellants fail to mention that this Advisory Committee Note is discussing 23(b)(1)(B), not 23(b)(1)(A). In their briefing, Appellants do not dispute the district court's failure to certify under (b)(1)(B), so we find this Note inapposite. Even if Plaintiffs were to appeal the (b)(1)(B) ruling, we would affirm the lower court's decision because we do not find that individual adjudications in this case would be dispositive of other class members' interests.

[43]  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Allison*, 151 F.3d at 412 (citing *Amchem*).

No. 09-40997

are insufficient to justify class certification.[44]  Therefore, the district court did not abuse its discretion in denying certification under Rule 23(b)(1)(A).

## V.

A court may certify a class under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole."[45]  We have previously stated that "this rule seeks to redress what are really group as opposed to individual injuries.  The uniformity of the injury across the class is what renders the notice and opt-out provisions of (b)(3) unnecessary."[46]  Moreover, injunctive relief is not appropriate to the whole class when final relief relates predominantly to money damages.[47]  Thus, a Rule 23(b)(2) inquiry requires considering two factors: 1) whether the defendant's behavior is generally applicable to the class as a whole, and 2) whether injunctive relief predominates over monetary relief.[48]

---

[44] *See, e.g.*, *Utility Consumers' Action Network v. Sprint Solutions, Inc.*, 259 F.R.D. 484, 488 (S.D. Cal. 2009).

[45] Fed. R. Civ. P. 23(b)(2).

[46] *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 975 n.22 (5th Cir. 2000).

[47] *See Allison*, 151 F.3d at 411; Fed. R. Civ. P. 23(b)(2) advisory committee's note, 1966 Amendment.

[48] *Bolin*, 231 F.3d at 975.

No. 09-40997

A.

"To qualify for class-wide injunctive relief, class members must have been harmed in essentially the same way . . . ."[49] This qualification differs from a predominance of common issues that Rule 23(b)(3) requires.[50] Instead of requiring common issues, 23(b)(2) requires common behavior by the defendant towards the class. In *Bolin v. Sears*, we found that Sears's central policies regarding bankrupt credit card consumers were sufficient to allege behavior generally applicable to the class.[51] Similarly, here, Fannie Mae had standardized policies with regard to how it treated its multi-family mortgagors. The Regulatory Agreements that each mortgagor signed were very similar, if not identical, and Fannie Mae had uniform policies with regards to the investment of mortgagor funds. Differences do exist among the mortgagors: some had Residual Funds and others did not; some invested part of their funds while others invested nothing; some communicated with Fannie Mae regarding their investments; and many no longer have mortgages serviced by Fannie Mae. But regardless of these differences, Fannie Mae's behavior and policy of investing the various funds is generally applicable to the class.

B.

Monetary relief predominates unless it is "incidental" to the requested injunctive or declaratory relief.[52] We have defined incidental to mean "damages

---

[49] *Maldonado v. Ochsner*, 493 F.3d 521, 524 (5th Cir. 2007).

[50] *See Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1105 (5th Cir. 1993).

[51] *Bolin*, 231 F.3d at 975.

[52] *Allison*, 151 F.3d at 415.

No. 09-40997

that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief."[53]  Such incidental damages should only be those to which class members would be automatically entitled once liability to the class is established.[54]

Here, monetary relief does not directly flow to the class members *as a whole*.  Plaintiffs accurately state that there are no subjective, mortgage-specific factors affecting the amount of profit realized by Fannie Mae.  However, Fannie Mae's earning of profits does not automatically entitle Plaintiffs to receive those profits in the form of disgorgement.  Plaintiffs must first prove liability by demonstrating a breach of fiduciary duty.  However, as we have discussed, each state has varying applicable law surrounding the creation of fiduciary duty.  Thus, liability could not be proven for this nationwide class as a whole.  Without the ability to prove class-wide liability, class-wide disgorgement is also not feasible.  The equitable relief is dependent on "subjective differences of each class member's circumstances," namely which state law applies to his or her claim.[55]

Classes certified under (b)(2) do not provide an absolute right to notice or opt-out.  These procedural safeguards are not required because a (b)(2) class is presumed to be homogeneous in nature, with few conflicting interests among its members.[56]  However, once subjective differences between class members arise,

---

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* at 413.

No. 09-40997

these procedural safeguards become necessary. Such is the case here. For example, some states have specific statutes that provide remedies for breach of trust. Damages include profits made by the trustee (sometimes with interest) as well as attorneys' fees.[57] Case law in several states also permits punitive damages for breach of fiduciary duty when there has been malice.[58] Plaintiffs eligible for disgorgement may also be interested in these additional monetary remedies. If all eligible plaintiffs are included in the proposed class, individuals who could possibly obtain a larger judgment outside of the class have no opt-out opportunity.

## C.

In assessing whether monetary relief predominates, a court must examine claims asserted in the context of the class composition.[59] In *Bolin v. Sears*, we vacated a (b)(2) certification because "most of the plaintiffs [were] seeking only damages" and had nothing to gain from an injunction since their relationship with Sears had ended.[60] Similarly, we have vacated a (b)(2) certification involving ERISA investments because "many potential class members" would not benefit from the requested injunction.[61] Finally, in *Maldonado v. Ochsner* we affirmed a denial of certification when the named plaintiffs would not benefit

---

[57] *See, e.g.*, Cal. Prob. Code § 16440; Ga. Code 53-12-193; Tex. Prop. Code § 114.001.

[58] *Rainsville Bank v. Willingham*, 485 So. 2d 319 (Ala. 1986); *Wagman v. Lee*, 457 A.2d 401 (D.C. 1983); *Citizens & So. Nat. Bank v. Haskins*, 327 S.E.2d 192 (Ga. 1985). *But see Packard v. Provident Nat. Bank.*, 994 F.2d 1039, 1048 (3d Cir. 1993) (holding that punitive damages cannot be recovered against trustee under Pennsylvania law).

[59] *Bolin v. Sears, Roebuck & Co.*, 231 F.3d at 976.

[60] *Id.* at 978.

[61] *Langbecker v. Electronic Data Sys. Corp.*, 476 F.3d 299 (5th Cir. 2007).

from injunctive relief. We noted that (b)(2) certification is "inappropriate when the majority of the class does not face future harm."[62]

Plaintiffs rely on our ruling in *Monumental Life*[63] to assert that (b)(2) certification would be appropriate in the present case, claiming *Monumental* held that eighteen percent of class members benefitting from an injunction is sufficient to warrant (b)(2) certification. In *Monumental Life*, plaintiffs challenged defendants' practice of charging higher life insurance premiums to African-Americans. Many class members no longer had insurance policies with the defendants, and the exact number of class members who would benefit from an injunction was unknown. Defense and plaintiff experts' estimates ranged from eighteen to eighty percent. Given these estimates, we found that "the proportion is sufficient, absent contrary evidence from defendants, that the class as a whole is deemed properly to be seeking injunctive relief."[64] In other words, absent additional evidence, the plaintiffs had sufficiently demonstrated that "most" of the class would likely benefit from injunctive relief.

Here there is no dispute regarding the number of proposed class members who would benefit from injunctive relief. The class is composed of mortgagors who have had multi-family loans serviced by Fannie Mae beginning in 1969. Both parties agree that over sixty percent of class-qualifying mortgages are no longer operative. Thus, less than forty percent of the class would benefit from

---

[62] *Maldonado v. Ochsner*, 493 F.3d 521, 525 (5th Cir. 2007); *see also In re Monumental Life*, 365 F.3d 408, 416 (5th Cir. 2004) ("Of course, certification under *rule 23(b)(2)* is appropriate only if members of the proposed class would benefit from the injunctive relief they request.").

[63] 365 F.3d 408 (5th Cir. 2004).

[64] *Id.* at 416.

the proposed injunctive relief. We find that given the other variables in this case, forty percent of the class benefitting from an injunction is not sufficient to certify under (b)(2).[65]

In contrast to *Monumental Life* and an earlier case, *Pettway*,[66] the case before us now is not a civil rights case. While (b)(2) classes are not exclusively reserved for civil rights disputes, this class type is especially suited for those plaintiffs.[67] In *Pettway*, for example, this Circuit allowed a class-wide back pay award under a (b)(2) certification for African-American employees who were victims of discriminatory employment practices. Appellants in this case compare their disgorgement to the *Pettway* back pay award. However, unlike Appellants, all of the *Pettway* plaintiffs would have benefitted from the injunctive relief requested. All were current employees of the defendant employer. Moreover, the injunctive relief awarded was substantial: restructuring the promotion procedures, overhauling the training programs, and creating a bi-racial committee of employees to act as an agent of the Board of Operatives. Based on the significant monetary relief sought and less central injunctive relief, the circumstances here do not warrant (b)(2) certification.

Finally, we are reminded that the district courts "are in the best position to assess whether a monetary remedy is sufficiently incidental to a claim for injunctive or declaratory relief."[68] We find that the district court applied the

---

[65] We also note that potentially less than forty percent of the class members still have uninvested funds.

[66] *Pettway v. Amer. Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir. 1974).

[67] *See* Fed. R. Civ. Pro. 23(b)(2) advisory committee's note, 1966 Amendment.

[68] *Allison*, 151 F.3d at 416.

No. 09-40997

correct legal standard for predomination under (b)(2) and do not find that the district court abused its discretion in failing to certify the class.

## VI.

For the foregoing reasons, we find the district court did not abuse its discretion in denying certification under either Rule 23(b)(1)(A), Rule 23(b)(2), or Rule 23(b)(3). The denial of class certification is AFFIRMED.

## VII.

Much of the record in this case is under seal pursuant to a Protective Order issued in November 2005. Prior to this appeal, Plaintiffs moved to unseal the record, but the district court did not rule on the matter. Plaintiffs carried the motion with their appeal of the class certification denial.

We have jurisdiction over the sealed documents because the district court's record transferred to us upon appeal.[69] However, the district court has greater familiarity with the record and is thus in a better position to balance the privacy interests with the public's potential common-law right to access the judicial records.[70] Therefore, we REMAND and refer the Plaintiff's motion to unseal the record to the district court for consideration.

---

[69] *See Fed. R. App. P.* 11.

[70] *See United States v. Comprehensive Drug Testing, Inc.*, 513 F.3d 1085, 1116 (9th Cir. 2008); *see also Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 599 (1978) ("The few cases that have recognized [a common-law right to access] do agree that the decision as to access is one best left to the sound discretion of the trial court . . . ."); *S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) ("[T]he common law merely establishes a presumption of public access to judicial records.").